**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case: 1:24-mj-00258<br>Assigned to: Judge Faruqui, Zia M.<br>Assign Date: 8/16/2024<br>Description: COMPLAINT W/ ARREST WARRANT |
|  | : |  |
| **v.** | : |  |
|  | : | **18 U.S.C. § 201(b)(2)** |
| **TRAYON WHITE, SR.,** | : | **(Bribery)** |
|  | : |  |
| **Defendant.** | : | **UNDER SEAL** |
|  | : |  |

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**</u>

I, Matthew Gano, being duly sworn, hereby depose and state as follows:

1.      This affidavit is submitted in support of a Criminal Complaint charging TRAYON WHITE, SR. ("WHITE") with Bribery in violation of 18 U.S.C. § 201(b)(2). As described further below, I respectfully submit that there is probable cause to believe that WHITE committed bribery in violation of 18 U.S.C. § 201(b)(2) by agreeing to accept and accepting items of value in return for: (1) being influenced in the performance of official acts; (2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; and (3) being induced to do or omit to do any act in violation of his official duties. Based on probable cause established in this affidavit, I request that the Court issue an arrest warrant for WHITE pursuant to Federal Rule of Criminal Procedure 4(a).

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office. I have been in this position since December 2017. During that time, I have investigated corruption involving local and federal officials, fraud against the government, bribery,

1

threat to life cases, and violations of civil rights committed under color of law, as a part of the FBI Washington Field Office Public Corruption and Civil Rights program. I have prepared and assisted in the preparation of search warrant applications and other legal process. Additionally, during the course of these and other investigations, I have conducted or participated in physical and electronic surveillance, assisted in the execution of search and arrest warrants, debriefed informants, interviewed witnesses and suspects, and reviewed other pertinent records. Through my training, education, and experience, I have become familiar with the efforts of persons involved in criminal activity to avoid detection by law enforcement. During my time as a Special Agent, I have been involved in numerous investigations as the primary investigator and in subsidiary roles. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      The information set forth in this affidavit comes from my personal involvement in this investigation, as well as from information provided to me by other law enforcement officers and people with knowledge of the case. This affidavit does not represent every fact known to law enforcement about this investigation and is submitted for the limited purpose of establishing probable cause to support the issuance of a criminal complaint and an arrest warrant.

## STATEMENT OF FACTS ESTABLISHING PROBABLE CAUSE

## TRAYON WHITE, SR.

4.      WHITE is a resident of the District of Columbia and serves as a Councilmember, representing Ward 8, on the Council of the District of Columbia. WHITE is the Chairperson of the Committee on Recreation, Libraries and Youth Affairs, which oversees several agencies including

the D.C. Department of Youth Rehabilitation Services (DYRS). WHITE is a public official; that is WHITE acts for and on behalf of the District of Columbia in an official function.

### Violence Intervention Initiative

5.      DYRS is responsible for the supervision, custody, and care of young people charged with a delinquent act in the District of Columbia who are detained while awaiting adjudication or who are committed to DYRS by a D.C. Superior Court judge following adjudication. The agency provides comprehensive support services to committed youth in secure facilities as well as within the community.

6.      Starting in 2016, DYRS has contracted with neighborhood-based organizations through its Credible Messenger Initiative to serve youth and families in neighborhoods most impacted by crime and incarceration. "Credible Messengers" are full-time employees of the neighborhood-based organizations who provide intensive mentoring and life coaching to DYRS youth and their parents/adult care givers. The "Credible Messenger" programming includes daily intensive support through evening group therapy sessions, support circles, crisis intervention, and 24-hour responsiveness. "Credible Messengers" also served as mediators and peace brokers in their own communities and throughout the District.

7.      The Office of Neighborhood Safety and Engagement (ONSE) is a D.C. Government agency created to address violence in the District and to assist families dealing with the grief and trauma caused by such violence.

8.      In 2018, ONSE launched the Violence Intervention (VI) Initiative, a collaborative community engagement strategy designed to support District residents in reducing gun-related

violence in their communities. ONSE contracted and partnered with community organizations to build partnerships with community members. The VI Initiative engages individuals as Violence Interrupters, who were outreach workers with an understanding of historical neighborhood conflicts. Violence Interrupters were responsible for: (1) building positive relationships with priority community members and developing partnerships with community organizations to implement violence intervention strategies; (2) serving as mentors to high-risk individuals; (3) identifying community and interpersonal conflicts with the potential to escalate to violence; (4) supporting the facilitation of ceasefires and mediations; and (5) responding to critical incidents to conduct information gathering, rumor control, and de-escalation. Violence Interrupters work with individuals, families, and communities most affected by violence, to help extricate people from cycles of violence.

## Relevant Persons and Entities

9.      Confidential Human Source 1 (CHS 1) operated several businesses that contracted with the District of Columbia or received subcontracts from businesses who contracted with the District of Columbia. On August 9, 2024, CHS 1 entered into a plea agreement with the United States whereby he agreed to plead guilty to Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349 and Bribery, in violation of 18 U.S.C. § 201, and is scheduled to execute that agreement before the Court on August 16, 2024. The charges to which CHS 1 is pleading guilty relate to fraudulent loans he obtained through the federal government's Paycheck Protection Program and other corruption offenses, including bribery of a District of Columbia public official. As part of that plea agreement, CHS 1 agreed to cooperate with law enforcement. Part of his

cooperation included disclosing other prior criminal conduct in which he had participated. In the course of his cooperation, CHS 1 reported a corrupt relationship with WHITE that is described in greater detail below.

10.     Government Employee 1 was an official in the Office of the Attorney General for the District of Columbia.

11.     Government Employee 2 was an appointed public official in the Executive Office of the Mayor of the District of Columbia.

12.     Government Employee 3 was a high ranking official in the ONSE.

13.     Government Employee 4 was a Supervisory Grants Management Specialist at DYRS.

14.     Company 1, a Washington, D.C., corporation, was owned and managed by CHS 1. Company 1 holds itself out as a community-based initiative to serve high-risk youths and adults throughout D.C. and Maryland. As part of the ONSE's VI Initiative, Company 1 contracted with the D.C. Government to provide violence intervention services in Wards 1 and 4 of Washington, D.C.

15.     Company 2, a Washington, D.C., corporation, was owned and managed by CHS 1. As part of the ONSE's VI Initiative, Company 2 contracted with the D.C. Government to provide violence intervention services in Ward 5 of Washington, D.C.

16.     Company 3, a nonprofit organization, provided family and mental health services to individuals in the District of Columbia. In 2023, Company 3 was awarded three grants by the ONSE, for Fiscal Year 2024, to provide quality assurance, compliance, and fiscal management to

subgrantees under the VI Initiative. The total value of the three grants was at least $10,702,945.60. The ONSE selected the subgrantees that contracted with Company 3 to provide the VI Initiative services.

### White's Lawful Duties as a D.C. Councilmember

17.    As a public official and Councilmember in the District of Columbia, WHITE had a lawful duty to perform his responsibilities consistent with the Council of the District of Columbia's Code of Official Conduct. The Code of Official Conduct prohibited WHITE from, among other things: (1) using his position to influence the outcome of a matter that he knows is likely to have a direct effect on his financial interests; (2) receiving any compensation, salary, or contribution to salary, gratuity, or any other things of value from any source other than the District government for his performance of official duties; (3) soliciting or accepting, either directly or indirectly, any gift from a "Prohibited Source"; (4) receiving anything of value in return for being influenced in the performance of official acts; (5) knowingly using the prestige of his office or public position for his financial gain or that of another; and (6) disclosing or using confidential or privileged information acquired by his position without authorization. *See* Council of the District of Columbia's Code of Official Conduct §§ I (a), (e)(1); III (a), (e)(2); VI (b)(1); VII (1).

18.    For purposes of the Official Code of Conduct, a "Prohibited Source" was defined as any person or entity that, among other things "has or is seeking to obtain contractual or other business or financial relations with the District Government." Council of the District of Columbia's Code of Official Conduct at § III (g)(2)(A). As so defined, CHS 1 was a "Prohibited

Source." Thus, WHITE, as a Councilmember, was not permitted to solicit or accept gifts from CHS 1 because CHS 1 was doing business with the District of Columbia.

19.     All councilmembers are required to file yearly financial disclosures and certifications which, among other things, confirm that they have: (1) complied with their duty to report known illegal activity, including attempted bribes, to the appropriate authorities; (2) not been offered or accepted bribes; (3) not directly or indirectly received government funds through illegal or improper means; (4) not received or been given anything of value, including a gift or political contribution, based on any understanding that the councilmember's official actions or judgment or vote would be influenced; and (5) that they completed a full ethics training within the last year. WHITE filed these financial disclosures and certifications for 2017 through 2023, the last of which was filed on May 15, 2024.

### WHITE Begins Taking Bribes from CHS 1

20.     In 2016, Company 1 entered into a multi-year Human Care Agreement ("HCA"), worth $6,288,806, with the District of Columbia, Department of Human Services ("DHS"). The HCA term was for a period of one base year for the not-to-exceed price of $971,342, and four option years, for the respective prices of $1,241,736, $1,288,884, $1,337,922, and $1,388,922. The D.C. Government exercised option year one from October 26, 2017, through October 25, 2018, and option year two from October 26, 2018, through October 25, 2019. As part of this agreement, Company 1 would provide case management services for chronically homeless and other highly vulnerable individuals and families experiencing homelessness. In accordance with the HCA, Company 1 was required to conduct criminal background checks on "[a]ll positions listed in the Provider's business plan having direct contact with children/youth."

21.     In January 2019, the DHS determined that the majority of the background check documents submitted by Company 1 to DHS were falsified – in other words, Company 1 was affirming it conducted background checks that it did not, in fact, do.

22.     On February 25, 2019, the DHS determined that Company 1 was in default of the HCA and, as a result, terminated the agreement.

23.     On August 14, 2019, Company 1 submitted a claim to the D.C. Government's Office of Contracting and Procurement demanding $4,015,728, alleging that the HCA termination was improper and demanding that the termination for default be converted to a termination for convenience. On September 17, 2019, Company 1 lowered its monetary demand to $1,593,960.

24.     On December 12, 2019, the D.C. Government's Office of Contracting and Procurement denied Company 1's claim.

25.     On February 28, 2020, Company 1 filed a notice of appeal of its demand denial with the D.C. Government's Contract Appeals Board.

26.     On March 25, 2020, attorneys in the Office of the Attorney General for the District of Columbia filed for summary judgment in Company 1's appeal to the Contract Appeals Board.

27.     On May 18, 2020, the Contract Appeals Board dismissed the appeal after Company 1 and the D.C. Government entered into a settlement agreement, which did not result in a payment to Company 1.

28.     According to CHS 1, during that time period, WHITE agreed to accept and accepted a $20,000 bribe payment from CHS 1 in return for using his official position as a Councilmember

to help CHS 1 resolve this contract dispute. Specifically, WHITE agreed to use his public position to pressure high ranking District government officials to resolve the dispute.

29.     On July 17, 2024, this prior payment to WHITE was discussed in a surreptitiously recorded meeting with CHS 1 in a way that suggests WHITE was not able to resolve the contract dispute in CHS 1's favor.   Specifically, WHITE referenced his attempt to coerce Government Employee 1 to resolve Company's 1 contract dispute. WHITE said: "I have to work and put everything in play. I am just trying to make sure… because… last time we was trying to do something like this… that shit messed up my relationship… because I was going… I ain't gonna lie because we was trying to get [Government Employee 1] to do something and he agreed to do it and he just never responded… and he just disappeared and stopped answering, even to this day." CHS 1 confirmed WHITE's statement that, "last time we was trying to do something like this" was a reference to the $20,000 payment he made to WHITE to induce WHITE to use his official position to pressure government employees, including Government Employee 1, to resolve the dispute over the termination of Company 1's HCA contract.

30.     In addition to the conduct reported above, CHS 1 reported corruptly giving WHITE gifts including travel to the Dominican Republic and Las Vegas, Nevada, prior to the conduct described below.

**The 2024 Criminal Conduct**

31.     Continuing their corrupt relationship, WHITE, in June 2024, agreed to accept approximately $156,000 in undisclosed kickbacks and cash payments from CHS 1 in return for using his position as a D.C. Councilmember to pressure government employees at the ONSE and

DYRS to extend Company 1's and Company 2's contracts for VI services in violation of his official and lawful duties as set forth in the Council of the District of Columbia – Code of Official Conduct. In furtherance of this scheme, to date, on four occasions, WHITE accepted cash bribe payments totaling approximately $35,000 from CHS 1, while CHS 1 was working covertly under the auspices of the FBI.

### Bribe Payment 1 – June 26, 2024

32.     On June 26, 2024, CHS 1 and WHITE met in CHS 1's car, which was parked outside the apartment building where WHITE was living in Washington, D.C. (The meeting was recorded.)   As set forth more fully below, during this meeting (1) CHS 1 offered to pay WHITE for ascertaining the status of CHS 1's companies' contracts with ONSE, (2) WHITE accepted a $15,000 bribe payment from CHS 1 for providing this and similar assistance to CHS 1, and (3) WHITE and CHS 1 agreed to meet again in furtherance of the bribery scheme.



(WHITE in CHS 1's car.)

33.      During the meeting, CHS 1 and WHITE discussed the VI contracts that Company 1 had with the ONSE: CHS 1 reminded WHITE that CHS 1's companies had large contracts with the District, and CHS 1 asked WHITE to ascertain whether those contracts would be renewed. CHS 1 then told WHITE that he had $15,000 for him and gave WHITE an envelope containing $15,000 in cash. Initially, WHITE stated: "what you need me to do, man? I don't, I don't wanna feel like you gotta gimme something to get something. We better than that." But WHITE put the envelope containing the money into his jacket pocket.[1]

---

[1] The transcriptions of conversations used in this affidavit are substantially accurate. They are not, however, final; and they are subject to revision upon further review.



(WHITE putting the envelope with the $15,000 into his jacket pocket.)

34.    CHS 1 and WHITE then discussed the specific tasks that CHS 1 wanted WHITE to perform, including WHITE meeting with Government Employee 2, to "get an idea" of what is going to happen with the contracts. WHITE responded: "So you trying to get an idea where they gonna go with the contracts?" CHS 1 confirmed that was the information he needed. CHS 1 added that "the biggest thing is just trying to figure out, are they keeping us this year with the contract."

35.     CHS 1 then suggested to WHITE that they meet again in two weeks. CHS 1 told WHITE that he would keep paying WHITE for his assistance with the contracts: "you know, we link up I guess another two weeks. But like I was telling you, I'm be able to keep hitting you off. You know what I mean?" While saying this, CHS 1 made a gesture with his hands mimicking giving money to WHITE. WHITE responded: "Yea."

36.     WHITE then mentioned that the D.C. Office of the Attorney General also runs a Streets Violence Interruption Program. WHITE said that the D.C. Government was trying to combine the Office of the Attorney General's program with the ONSE to bring all the VI work into one office. WHITE then told CHS 1 that Government Employee 3 was unlikely to remain a high ranking official at the ONSE.

37.     CHS 1 then directed WHITE to determine the status of CHS 1's company's contract with the ONSE: "Are they going to give us a contract? Are they going to stay with the same vendors?" CHS 1 then told WHITE that: "It's cool, in two weeks, we can go over everything, go over your whole plan. But if you can, definitely man, that's for you, so definitely please take, please, please use that to take care of the stuff for [Government Employee 3]. You know what I mean?" To which WHITE appears to respond, in part, "Yea."   By "that" CHS 1 meant that the $15,000 he had given to WHITE was for WHITE's assistance in determining the status of CHS 1's company's contract with the ONSE.

38.     CHS 1 and WHITE concluded their meeting with a discussion of other opportunities for WHITE and CHS 1 to work together, where WHITE would assist CHS 1 in securing contracts with the D.C. Government:

| CHS 1: | I was gonna say too, even something to think about too, I can do something like this twice a month, for right now, for the next 90 days. But I want, I wanna strategically work with you to like… |
|---|---|
| WHITE: | And I've got other shit we can be doing too. |
| CHS 1: | That what I'm saying. That's what I'm saying. I want to knock this out. Then for the next meeting, let's brainstorm and go over everything. That's cool? |
| WHITE: | What I want you to start thinking about is how we get into the mental health space…. |
| CHS 1: | I gotta go. I gotta jet. Listen. Listen. Two weeks …. |
| WHITE: | You ain't gonna disappear on me. |
| CHS 1: | No. No. No. Listen this is my word bro. |
| WHITE: | Like there's so much shit we be doing. |
| CHS 1: | That's what I'm saying. |
| WHITE: | Got four more new years… |

The meeting concluded, and WHITE exited CHS 1's car.

### Bribe Payment 2 – July 17, 2024

39.     On July 17, 2024, CHS 1 and WHITE met in CHS 1's car, which was parked outside the same apartment building as their prior meeting. (The meeting was recorded.) As set forth more fully below, during this meeting (1) WHITE updated CHS 1 on his efforts to secure grants from the D.C. Government for CHS 1's companies, (2) WHITE and CHS 1 discussed CHS 1's portfolio of contracts with the D.C. Government and they agreed that WHITE would receive a 3% kickback on each contract, and (3) WHITE raised other D.C. Government contracting opportunities that they should pursue.   Additionally, WHITE indicated that he needed money. Accordingly, CHS 1 left to retrieve $5,000; CHS 1 then returned and gave WHITE $5,000.



(WHITE in CHS 1's car.)

40.      WHITE updated CHS 1 on his efforts to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2. CHS 1 offered and White agreed to accept a kickback of 3% of each grant's value in exchange for WHITE's assistance in this regard.

41.      WHITE reported that he had followed up with Government Employee 2 but that he/she was not very helpful. To circumvent Government Employee 2, WHITE said that he had contacted two DYRS employees who oversee some of DYRS's grants: "So what I did was, I connected with two of the people that's over top of giving out the grants… One of them… now this the, this where I am now, I don't know all of them personal yet." WHITE then stated he was in contact with Government Employee 4 and that he was scheduled to meet with him/her later that day: "I been talking to [Government Employee 4] all week. Just kind of building relationship, just trying to feel [him/her] out… and I got a follow-up conversation with [him/her] today… So what

I'm doing is I'm circumventing the head [Government Employee 2] and dealing with the relationships on the ground, you know what I'm saying… because I don't know [Government Employee 2] that well to really have a… (gestures hands back and forth) like we talk."

42.     CHS 1 produced a ledger (depicted below), listing all of Company 1's and Company 2's grants from D.C. Government agencies, the total value of each grant, and WHITE's corresponding 3% cut:



43.     CHS 1 and WHITE discussed the individual VI contracts:

CHS 1:          What I was thinking with you, is, if you are able to seal this up.

WHITE:          Yea.

CHS1:          I will give you 141[,000].

WHITE:         (Looking at the paper) Okay.

CHS 1:         Which is 3%.

WHITE:         (Nods his head in the affirmative)

CHS 1:         So 3% of the 51, I mean 3% of 1.7 is 51.

WHITE:         Okay.

CHS 1:         3% of 1.3 is 39.

WHITE:         Now. Question. All these through the ONSE office?

CHS 1:         This is through the ONSE and this is…

                    (WHITE showed his phone to CHS 1.)

WHITE:         Tomorrow, looking who I am meeting with tomorrow…

CHS 1:         [Government Employee 3].

WHITE:         Tomorrow. So I have been lining everything up.

CHS1:          Makes sense.

WHITE:         You know what I'm saying, because I ain't gonna miss the mark… what I
               am trying to do is cross all, cross all sectors… I got to find [Government
               Employee 4's] number though. [She/he] did call me.

44.    WHITE then pointed out that Government Employee 3 was the interim [high
ranking official], and that Government Employee 3 did not know if she/he was going to be made
the permanent [high ranking official] of the ONSE. WHITE said: "that's why I want to go talk to
[him/her] and tell [him/her] I can be supportive if this, this and this, now this, this and this… I am
just going to tell [him/her] I don't know how much I can be supportive if this don't happen… I am
just being real." CHS 1 understood that WHITE's "this, this and this" remark was a reference to

the renewal of CHS 1's contracts for Company 1 and Company 2. WHITE explained that part of the reason for setting the in-person meeting at the ONSE was: "cause I really want to walk around there and see who works there. So I am going there in person… cause I kinda want to get a feel for whose running what… because there's people making decisions that may not have a high title."

45.    WHITE then searched his phone and found the name of the person he previously referenced from DYRS, Government Employee 4. WHITE mentioned that he was going to meet with Government Employee 4:

WHITE:     Oh, [Government Employee 4] … oh, here you go… this [her/him] right here

CHS 1:     [Government Employee 4] going over to the ONSE?

WHITE:     [Government Employee 4]?

CHS 1:     She/he going over to the ONSE?

WHITE:     No. [She/he] at DYRS.

CHS 1:     Yeah. Yeah. Yeah. So the Credible Messenger [unintelligible].

WHITE:     Yeah.

*              *              *

WHITE:      [Government Employee 4]

CHS 1:     I have never met [her/him] before. I have just seen [her/him] on a few emails… I did submit this stuff. So you, you know [her/him]?

WHITE:     I, I'm meeting [her/him], I don't know [her/him] prior to this.

CHS 1:     Gotcha, gotcha, gotcha. So you, so you may be able to solidify that too then.

WHITE:     (WHITE nods his head yes) I got to meet with [her/him] today.

CHS 1:     Yeah. So that's right here. That number right here: 15.

18

WHITE:       I have been texting back and forth this week and I told [her/him] I need to meet with [her/him] in person, today.

CHS 1:       Gotcha

WHITE:       I didn't know if you wanted to meet [with her/him].   I wanted to keep you isolated.

CHS 1:       Yea…I definitely…but look… I did the numbers for that.   So that will be 15. That's 15K. 3% of the 500k.

While saying the above, CHS 1 referenced the ledger (depicted above), that WHITE was looking at, noting the numbers that corresponded to Company 2's Credible Messenger contract with DYRS.

46.     Later in the conversation, CHS 1 again referenced the ledger listing the contracts and payments:

CHS 1:       Are these all agreeable to you?

WHITE:       Gave me. Yeah. You gave me… I mean we, we good, we can worry about the money later. This issue is, stay on, stay on mission… make sure we still can…keep everybody. Keep everything afloat cause…

CHS 1:       But if you need anything, I can meet you back in an hour.

WHITE:       Yeah. I'm hurting. I've been hurting for a minute.

After WHITE said that he was "hurting," CHS 1 agreed to meet WHITE in an hour to give him another cash payment.

47.     CHS 1 and WHITE then discussed business opportunities in the mental healthcare space, which WHITE had mentioned in their June 26, 2024, meeting. CHS 1 expressed an interest in partnering with WHITE on contracts for mental health services. WHITE estimated that the value of the contracts could be $15 to $20 million. CHS 1 then remarked "3% of that is good." When

WHITE explained that he wanted to determine CHS 1's interest in this business, CHS 1 repeatedly

stated, "let's do this." WHITE responded "yea." The conversation continued:

| | |
|---|---|
| CHS 1: | This ain't nothing compared to that [referencing the DYRS and the ONSE contracts] |
| WHITE: | (nodding in agreement) And that shit federal…that shit ain't never going nowhere...never… |
| CHS 1: | It's more stable… |
| WHITE: | You ain't gotta keep waiting for it… |
| CHS 1: | It's more stable… |
| WHITE: | Man that shit ain't going nowhere… |
| CHS 1: | And once you get the clients, you keep'em. |
| WHITE: | That shit ain't going nowhere, bro…that shit a cash cow. |
| CHS 1: | Let's do it man. |

48.     WHITE then suggested that they also explore the housing sector: "The last piece of

that is housing. Housing is where you are going to get most of the money because … (motions

with hands) around the clock, it's different than the DYRS shit, that shit… man…"

49.     They agreed to meet again in thirty or forty minutes. And CHS 1 left to retrieve

the cash that WHITE had previously requested.

50.     Approximately an hour later, CHS 1 returned to the location of his last meeting

with WHITE. CHS 1 asked WHITE, if they meet again in a few weeks, how much money WHITE

would want. WHITE responded: "Let's play it by ear because I don't really got no real demand at

the moment. I got to work to put everything in play… So I just want to put everything in place, so

I can put everything in motion."

51.     CHS 1 then handed WHITE an envelope with $5,000, as WHITE had requested. CHS 1 said: "that's for, making sure you reach out to [Government Employee 3] and [Government Employee 4]." WHITE responded: "I am on top of all that... you know me, I'm already moving. I'm going to put … Once you and I lock eyes and gets to an understanding, I gets to work. I can start making some shit happen." WHITE then referenced his meeting with Government Employee 4 later that day and meeting with Government Employee 3 the next day.



(WHITE receiving an envelope containing the $5,000 payment.)

52.     CHS 1 and WHITE then discussed additional bribe payments. CHS 1 told WHITE to let him know how much he needs and CHS 1 would provide it. WHITE mentioned that his girlfriend was going out of town the next day and that because WHITE was meeting CHS 1 today, WHITE knew that he would have some cash for his girlfriend's trip.

**Bribe Payment 3 – July 25, 2024**

53.     On July 19, 2024, WHITE texted CHS 1, stating that he needed to meet and that it was "urgent".[2]



54.     WHITE explained he wanted to introduce CHS 1 to an individual who could help them get into the mental healthcare space:

---

[2]     In the text messages, the white bubbles are messages from WHITE, and the green bubbles are messages from CHS 1.



55.     WHITE also told CHS 1 that he had a meeting with two high-ranking government officials to facilitate CHS 1's obtaining contracts with the D.C. Government:



56.     On July 24, 2024, WHITE texted CHS 1, asking to meet. WHITE wanted to provide an update on his progress facilitating the renewal of Company 1's and Company 2's contracts with the D.C. Government. WHITE also wanted to receive another payment. In addition, following the private meeting between CHS 1 and WHITE, they planned to meet another individual to discuss business opportunities in the mental healthcare space. WHITE specifically requested that CHS 1 "bring 10."  CHS 1 understood that this was a request by WHITE for $10,000. When CHS 1 responded that he could only give WHITE "5," WHITE responded: "Please do 10. I have to keep my word."




57.     On July 25, 2024, WHITE met CHS 1 in his car, which was parked on a street in Washington, D.C. (The meeting was recorded.) As set forth more fully below, during this meeting (1) WHITE updated CHS 1 on his efforts to facilitate CHS 1's companies securing contracts with the D.C. Government, (2) WHITE raised and discussed additional contract opportunities that he and CHS 1 should pursue, (3) WHITE and CHS 1 discussed the kickback payments that WHITE would receive for his efforts on CHS 1's behalf (including reviewing the ledger again), and (4)

CHS 1 gave WHITE the $10,000 bribe payment that WHITE had solicited, as noted in the text messages above.

58.     After entering the car, WHITE said: "I feel good energy about what we embarking on, what we trying to do. I want to bring you up to speed before we go in here about stuff I've been working on, trying to get you where you need to be."

59.     WHITE told CHS 1 that he had spoken with Government Employee 4 about the renewal of the Company 2's Credible Messenger contract with DYRS:

WHITE:          So I followed back up with that [guy/girl].

CHS 1:          [Government Employee 4]?

WHITE:          Yes.

CHS 1:          The grant manager.

WHITE:          Yea. That's looking good… that looking good there.

                […]

CHS 1:          Like 48 applicants applied or something…

WHITE:          I don't know. I didn't get the details. I just told [Government Employee 4] where I stood and what I need to see happen. Then I followed up with… umm…

CHS 1:          And [Government Employee 4] was like, [Government Employee 4] was like on board with it?

WHITE:          Yea, [Government Employee 4] all the way, [grant manager] all the way a go.

CHS 1:          Okay.

WHITE:          It's [Government Employee 4] and another lady. So [Government Employee 4] got to work to massage her… [Government Employee 4] got to work to massage the other [person]. But I'm going to stay in

communication with [Government Employee 4] because [Government Employee 4] definitely gonna be helpful. But I think that was a small, that was the smaller one of the two.

60.     CHS 1 produced the ledger listing the four contracts (three with the ONSE and one with the DYRS) and laying out the total amount of each grant and WHITE's 3% cut. WHITE reviewed the ledger as CHS 1 explained that WHITE will be paid $15,000, which is 3% of the $500,000 contract with DYRS for the Credible Messenger program:

CHS 1:     Lemme show you… so trying to recap 'cause if get the credible messenger jump, 500.

WHITE:     Yes.

CHS 1:     Cause you get the 15.

WHITE:     Yes.



(WHITE in CHS 1's car, reviewing the total amount of each contract and WHITE's 3% cut.)

61.     CHS 1 and WHITE then discussed the three VI contracts with the ONSE:

27

| | |
|---|---|
| CHS 1: | Then we get these three ONSE, that's underneath [Government Employee 3]. |
| WHITE: | Alright |
| CHS 1: | Floating team, Company 1 [Wards] 1 & 4 and Ward 5 Violence Prevention Network. |
| WHITE: | So let me talk about those three real quick. So I met with [Government Employee 3]. |
| CHS 1: | [Government Employee 3's title.] |
| WHITE: | I wasn't able to talk to [Government Employee 3] as direct as I need to be because there was another person in the room. |
| CHS 1: | Mmm hmm. |
| WHITE: | But I told [Government Employee 3] what I would like to see happen and… |
| CHS 1: | And was it more like try keep the same people? |
| WHITE: | Yeah. No, I mentioned and I tell [Government Employee 3] [Company 1]. |
| CHS 1: | Okay. |
| WHITE: | You know, um, 'cause I don't wanna speak too general. I told [Government Employee 3], you know it, but, and [Government Employee 3] was confused because [she/he's] like, is [Company 1] even in your ward. Mm-Hmm. And I'm like, uh, so I, so I I, I mentioned [Company 4] too, just because I like these two… |

62.     WHITE said that he did not believe that Government Employee 3 would be appointed to a permanent role at the ONSE, as he had been asked by a senior D.C. Government official to provide a list of possible replacements. WHITE said that he told Government Employee 3, "the only way I'm gonna support you, if you support me. Because I have to sign off on [his/her] confirmation. Now I'm only one of 13. They can still get it passed without me. But I'm a huge voice when it comes to violent prevention and the Council. Just cause who I am, you know, the

work I've been doing." The use of Government Employee 3's job as leverage had been mentioned by WHITE, during his prior meeting with CHS 1 on July 17, 2024, when CHS 1 gave WHITE a $5,000 payment.

63.     WHITE then said: "We in a good place with the ONSE, but I want to make sure that we cross the finish line and get to what we want to get with this . . . ." WHITE added: "I think that I got to massage it a little bit more and I got. I got an inside person that I am working with on.…" At that point, CHS 1 handed WHITE an envelope containing the $10,000 he had previously requested.



(WHITE putting an envelope containing the $10,000 payment into his jacket pocket.)

64.    As WHITE accepted the payment, CHS 1 stated: "You def going to keep it going right?" WHITE responded "yea, yea, I'm… I have a long-term strategy I'm working on but I want… what I am trying to get from them is the inside people, that who I am working with.   I got one person, it's a lady, she doesn't want me to say her name but I am working with her and I think that's going to help us get in further beyond this, to get some other stuff going." WHITE concluded the meeting saying: "I think that we, as far as the stuff we got going now, it's cool but we got to also start thinking about other stuff."

**Bribe Payment 4 – August 9, 2024**

65.    On August 2, 2024, CHS 1 texted WHITE to get an update on WHITE's progress securing the contract renewals for Company 1 and Company 2. WHITE responded: "Waiting on one call. Heard it was this week. Pushing on Wednesday, so I'm hoping it's before Thursday."



66.     On August 8, 2024, CHS 1 texted WHITE to setup a meeting to get an update on the status of the contract renewals. CHS 1 asked WHITE if he needed him to "bring anything." WHITE initially responded: "Let me check on that in an hour when I wrap up this meeting." WHITE later texted: "Nothing is needed unless you're feeling generous lol." CHS 1 responded: "I'm definitely feeling generous if we got project 1 and 2 on lock tomorrow." "Project 1" and "project 2" were references to CHS 1's contracts with the ONSE and DYRS. WHITE responded: "I haven't seen anything in writing, but from what I'm being told you should be good on both." CHS 1 responded: "If you knock it out the park I got you. What sounds to you."

 

67.     On August 9, 2024, WHITE responded: "Can you do half?" which CHS 1 understood to mean that WHITE was asking for $5,000, as CHS 1 had previously paid $10,000 to WHITE. CHS 1 agreed to give WHITE $5,000.



(WHITE in CHS 1's car.)

68.     Later that morning, at approximately 10:30 a.m., WHITE met CHS 1 in his car, parked outside a residence located in Washington, D.C. (The meeting was recorded.) As set forth more fully below, during this meeting (1) WHITE updated CHS 1 on his efforts to renew CHS 1's companies' contracts with the D.C. Government, (2) CHS 1 gave WHITE the $5,000 bribe payment that WHITE had solicited, and (3) they discussed their next meeting.

69.     After entering the car, WHITE provided an update on the status of his efforts to use his official position as a Councilmember to pressure government employees to renew CHS 1's contracts:

| | |
|---|---|
| CHS 1: | Yeah. I talked to [Person 1]. He said he talked to some of the program people said things is looking good on your end. |
| WHITE: | Yeah. |
| CHS 1: | How'd everything work out with your folks? |
| WHITE: | Yeah, he said everything looking good. |
| CHS 1: | You talked to [Government Employee 4]? |
| WHITE: | I talked to, I told you who I talked to.   I talked to uh, I talked to so many people fucking with you man, I don't even like talking to. I talked to [a senior D.C. Government official]. I talked to [Government Employee 2] that's who really, that's who really… |
| CHS 1: | That's for the ONSE joint. |
| WHITE: | But [he/she], [Government Employee 2], [he/she control] the ONSE. |
| CHS 1: | Yeah. |
| WHITE: | I talked to um, uh, [Government Employee 3]. Now, I really told [him/her] that if [he/she] don't support me and what I'm trying to do with my, both my service providers, I can't support [him/her], uh, getting 'cause [he/she] not confirmed yet. |
| CHS 1: | For the [high ranking position]. |
| WHITE: | Ya, I said I can't confirm. I just basically said it like that. You know what I'm saying? |
| CHS 1: | Mm-Hmm. |
| WHITE: | In a way to show like, listen, you do this, I can do this or you can't do this, I can't do that. |

CHS 1:          Mm-Hmm.

WHITE:          Yeah. I got great weight when it comes to violence and work on that council.

The use of Government Employee 3's job as leverage was mentioned by WHITE, during his prior

meetings with CHS 1 on July 17 and 25, 2024.

70.     CHS 1 then handed WHITE an envelope containing the "half" he requested, which

was $5,000. As he gave the cash to WHITE, CHS 1 stated that the payment was because "I know

you've been handling your business." WHITE responded "Yeah." CHS 1 then confirmed that he

had just listed the people who WHITE had promised to pressure "[b]ut I you just went down the

list to everybody." WHITE then stated, "Yeah man. I'm gonna do mines."



(WHITE receiving an envelope containing the $5,000 payment.)

71.     CHS 1 and WHITE then discussed WHITE's efforts to use his position as a Councilmember to pressure employees of DYRS to approve Company 2's contract for the "Credible Messenger" program:

WHITE:          So I talked to her, man. Who else I talk to? I talked to, um…

CHS 1:          [Government Employee 4].

WHITE:          What's the [guy/girl] name? I can't remember all these people name. It was a [guy/girl] at the, it was a [guy/girl] at, um, I talked to somebody at DYRS. I talked to somebody at the ONSE office.

CHS 1:          I think it was [Government Employee 4], you said.

WHITE:          [Government Employee 4]? I told you the name. I don't remember.

CHS 1:          It was [Government Employee 4].

WHITE:          [Government Employee 4], okay. But it was, I, I, I talked to it is another lady that I'm working with that got insight on what's going on. I been, I've been talking to her. I met with her one time. I talked to her too. But it's a, uh, who else I met with? Man, I been meeting with all these people, man.

CHS 1:          Mm-Hmm.

WHITE:          Um, just to kind of…

CHS 1:          Appreciate you man.

WHITE:          Just trying to, and also trying to figure out what other new opportunities are coming.

CHS 1:          Yeah.

WHITE:          Because while we focus on this shit, we gotta keep...

CHS 1:          Keep moving, keep moving.

WHITE:          Yeah. So I end up talking to uh, I also talked to the Director DYRS, but he didn't know shit. He didn't know, he didn't know nothing. But I realized that he don't know nothing because [Government Employee 2] put people in his office to make sure his shit running. He just the name.

72.     CHS 1 and WHITE next discussed the timing of an additional payment.   Then WHITE] exited the car.

36

## CONCLUSION

73.     Based on the above facts, as well as the training and experience of other law enforcement agents with whom I have spoken and my own experience, I respectfully submit there is probable cause to believe that WHITE engaged in Bribery in violation of Title 18, United States Code, Section 201(b)(2).

_____
Special Agent Matthew Gano
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 16th day of August, 2024.

_____
HON. ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE