**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     Criminal Action No.: 24-406 (RC) |
| v. | : |
| | :     Re Document Nos.:   24, 25, 29, 38, |
| TRAYON WHITE, SR., | :                              39, 40, 41, 42, 44 |
| | : |
| Defendant. | : |

<u>**MEMORANDUM OPINION**</u>

**RESOLVING THE PARTIES' PRETRIAL MOTIONS**

## I.  INTRODUCTION

Defendant Trayon White, Sr., is charged with one count of bribery, in violation of 18

U.S.C. § 201(b)(2).  A jury trial is currently scheduled to begin in September 2026.  Mr. White

has filed two motions to dismiss the indictment, and both parties have filed motions *in limine*.

For the reasons stated below, the Court denies Mr. White's motions to dismiss and resolves the

parties' various motions *in limine*.

## II.  BACKGROUND

Mr. White is a member of the Council of the District of Columbia, on which he

represents Ward 8.  Indictment ¶ 1, ECF No. 12.  Mr. White stands accused of participating in a

bribery scheme whereby Confidential Human Source 1 ("CHS-1") offered and paid Mr. White

cash, which he accepted, in exchange for directing D.C. government agency contracts to CHS-

1's businesses.  *See id.* ¶ 69.

According to the Indictment, Mr. White "was the Chairperson of the Committee on

Recreation, Libraries and Youth Affairs, which oversaw several agencies including the D.C.

Department of Youth Rehabilitation Services (DYRS)."  *Id.* ¶ 1.  The "DYRS was responsible

for the supervision, custody, and care of young people charged with a delinquent act in the District of Columbia." *Id.* ¶ 5. To provide services, DYRS "contracted with neighborhood-based organizations through its Credible Messenger Initiative." *Id.* ¶ 6. In addition, the "Office of Neighborhood Safety and Engagement (ONSE) was a D.C. Government agency established to address violence in the District of Columbia" through programs such as its Violence Intervention ("VI") Initiative. *Id.* ¶¶ 7–8. CHS-1 "operated several businesses that contracted with the District of Columbia or received subcontracts from businesses that contracted with the District of Columbia," including through ONSE's VI Initiative. *Id.* ¶¶ 9, 14–16.

According to the Government, Mr. White began taking bribes from CHS-1 in 2019. *See id.* ¶¶ 18–25. One of CHS-1's companies had contracted since 2016 with the District of Columbia's Department of Human Services ("DHS") to "provide case management services for chronically homeless and other highly vulnerable individuals and families experiencing homelessness." *Id.* ¶ 17. In February 2019, DHS determined that the company had defaulted on its agreement by submitting falsified background-check documents and terminated the contract. *Id.* ¶¶ 18–19. Sometime in 2019 or early 2020, Mr. White allegedly "accepted $20,000 in cash from CHS 1 in return for using his official position as a Councilmember to help CHS 1 resolve this contract dispute," which ultimately resulted in a settlement agreement. *Id.* ¶¶ 24–25.

The Indictment then jumps in time to the alleged scheme at issue here, whereby Mr. White accepted four bribe payments in cash totaling $35,000 from CHS-1 over the summer of 2024 "in exchange for using his position as a D.C. Councilmember to assist [two of CHS-1's companies] extend their contracts at the ONSE and DYRS for VI services." *Id.* ¶ 69. As part of their arrangement, Mr. White would receive a three percent kickback of the contracts awarded to CHS-1's companies. *See id.* ¶¶ 35, 37–38, 40, 42, 55. But Mr. White did not know at the time

that CHS-1 was cooperating with the FBI and that each of these four cash payments was being recorded.

In September 2025, a Grand Jury returned the Indictment in this case, charging Mr. White with one count of bribery related to his conduct in the summer of 2024. *See id.* ¶ 69; ECF No. 13-3. A jury trial was previously scheduled to begin on January 12, 2026. *See* Pretrial Order at 1–2, ECF No. 22. In the lead up to trial, the Government filed two briefs with motions *in limine* in September and October 2025. Gov't Omnibus Mots. *in Lim.* ("Gov't Omnibus MIL"), ECF No. 24; Gov't Mot. *in Lim.* to Admit Certain Evid. ("Gov't 2d MIL"), ECF No. 29. Mr. White's counsel at the time largely opposed the Government's omnibus brief. *See* Def. Omnibus Opp'n, ECF No. 26. In October 2025, before the Court heard argument on those motions, Mr. White notified the Court that he had hired new counsel and sought a continuance to prepare for trial, which—after an additional continuance based on the Government's latest document production—is now scheduled for September 2026. *See* Min. Entry (Oct. 22, 2025); Min. Entry (Feb. 12, 2026).

In January 2026, the Government filed a supplemental motion *in limine* to authenticate additional evidence. Gov't Suppl. Mot. *in Limine* to Admit Certain Evid. ("Gov't Suppl. MIL"), ECF No. 38. Mr. White's new counsel filed two motions to dismiss and two motions *in limine*, as well as a supplemental opposition brief to the Government's omnibus motions brief. *See* ECF Nos. 39–44. The Court has considered the parties' briefs and the arguments made at the hearing held on these motions on February 25, 2026.

### III.  LEGAL STANDARD

"[A]n indictment's main purpose is 'to inform the defendant of the nature of the accusation against him.'" *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting

*Russell v. United States*, 369 U.S. 749, 767 (1962)).  Thus, an indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations."  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).  And "because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances."  *Id.* at 148 (cleaned up).

"Motions *in limine* are designed to narrow the evidentiary issues at trial."  *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010).  "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  In addition to facilitating a more efficient trial, pretrial rulings on such motions benefit the parties by enabling "counsel to make the necessary strategic determinations" in response to the rulings.  *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980), *overruled on other grounds by United States v. Lipscomb*, 702 F.2d 1049, 1056 (D.C. Cir. 1983) (en banc).  District courts have broad discretion when making these evidentiary rulings. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008).

## IV.  ANALYSIS

As an initial matter, the Court rules on Mr. White's motions to dismiss the Indictment. Because he fails to identify a legal deficiency warranting that relief, the Court denies his motions to dismiss.  The Court then proceeds to discuss the Government's motions *in limine* and finally Mr. White's motions *in limine* in the order in which the parties briefed them.

### A. Defendant's Motions to Dismiss

Mr. White filed two motions to dismiss the Indictment, one arguing that the Indictment is impermissibly duplicitous, Mot. Dismiss ("MTD"), ECF Nos. 39, 44, and the other arguing that the Indictment fails to allege an "official act" as required under 18 U.S.C. § 201(b)(2)(A), Mot. Dismiss ("2d MTD"), ECF No. 40. The Court denies both motions.

#### 1. *Motion to Dismiss Indictment as Duplicitous and to Exclude Evidence of the 2019 Bribe*

Mr. White's first motion to dismiss argues that the Indictment "improperly joins four distinct offenses in a single count." MTD at 1. He argues that each of the four bribe payments in the summer of 2024 constitutes a separate offense, and that maintaining all four in a single count potentially violates his Fifth and Sixth Amendment rights. *See id.* at 4–5. Somewhat relatedly, Mr. White moves to preclude evidence of the 2019 bribe alleged in the Indictment. *See id.* at 5– 7. The Government responds that the Indictment properly charges Mr. White for his involvement in a "bribery scheme." Gov't Opp'n to Def.'s Mot. Dismiss ("Gov't Opp'n MTD") at 1, ECF No. 47. The Government also contends that the 2019 conduct is "inextricably intertwined with the charged offense" or, at a minimum, admissible under Federal Rule of Evidence 404(b). *Id.* at 3–6. The Court agrees with the Government that the Indictment is not impermissibly duplicitous and that evidence of the 2019 conduct is admissible.

"Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Hubbell*, 177 F.3d 11, 14 (D.C. Cir. 1999) (per curiam). The "purposes of the prohibition against duplicity . . . include generally: (1) the prevention of double jeopardy, (2) an assurance of adequate notice to the defendant, (3) the provision of a basis for appropriate sentencing, and (4) the danger that a conviction was produced by a verdict that may not have been unanimous as to any one of the crimes charged." *United States v. Shorter*, 809 F.2d 54, 58

n.1 (D.C. Cir. 1987), *abrogated on other grounds by Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). But where the defendant's actions can "legitimately be regarded as a single course of conduct and the purposes of the bar against duplicity" are otherwise satisfied, then an indictment is not defective merely because it alleges in a single count multiple acts in furtherance of a scheme. *United States v. Bruce*, 89 F.3d 886, 890 (D.C. Cir. 1996); *see also Shorter*, 809 F.2d at 56 ("It is well established that two or more acts, each of which would constitute an offense standing alone and which therefore could be charged as separate counts of an indictment, may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme." (cleaned up)); *United States v. Klat*, 156 F.3d 1258, 1266 (D.C. Cir. 1998) ("However, several acts may be charged in a single count if the acts 'represent a single, continuing scheme that occurred within a short period of time and that involved the same defendant.'" (quoting *United States v. Alsobrook*, 620 F.2d 139, 142 (6th Cir. 1980)).

Here, the Court reads the Indictment to allege that the four payments CHS-1 made to Mr. White between June and August 2024 were part of a single, continuing scheme. Though Mr. White argues that "nowhere in the Indictment is there language stating that the CHS 1 and White were part of an 'ongoing scheme to commit bribery,'" his argument is refuted by the Indictment itself. *See* Def.'s MTD Reply at 4, ECF No. 59. The Indictment labels the four bribe payments just that, using the heading "2024 Acts in Furtherance of the Bribery Scheme." Indictment at 7. And though the Indictment documents four separate bribe payments, nowhere does it allege that each payment was made for a discrete, separate promise. *See id.* ¶¶ 27–67. Instead, as the Government explains, the Indictment is fairly read as alleging the Mr. White agreed to perform his half of the bargain "as opportunities arise." *See* Gov't MTD Opp'n at 2 (citing *United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021)). Under this theory, "the

6

government does not have to prove an explicit promise to perform a particular act made at the time of payment" but can instead prove that "the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise." *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993).

In support of its theory of this type of scheme, the Government emphasizes the ledger provided in the Indictment that appears to calculate Mr. White's 3% kickback based on multiple potential contracts for CHS-1's companies. *See* Indictment ¶ 37. This ledger does not tie the bribe payments to any particular contract, and the ledger was brought out at multiple meetings at which CHS-1 paid Mr. White, indicating a continuity of purpose across payments. *See id.* (July 17, 2024 payment); *id.* ¶ 55 (July 25, 2024 payment). Moreover, the three months over which the payments occurred are not so temporally distant as to defeat the Government's argument that these actions were part of a single, continuing scheme. *See Klat*, 156 F.3d at 1266 ("We do not believe, however, that six months is too long a period for acts charged in an indictment to constitute a single, continuing scheme.").

Crucially, none of the purposes of the prohibition on duplicity is an impediment to the Indictment here. The Indictment gives clear notice of the bribery scheme alleged, which took place "[f]rom June 26, 2024, to August 18, 2024" as outlined above. Indictment ¶ 69; *see Bruce*, 89 F.3d at 890. This timeframe also reduces the risk that Mr. White would be charged again for the same conduct. *See Bruce*, 89 F.3d at 890. Further, an instruction that the jury "must unanimously agree on the overall scheme and at least one of the specified acts in furtherance of the scheme" would address Mr. White's concerns of a nonunanimous verdict. *Id.*; *see* MTD at 5; *see also United States v. Garcia-Limon*, 146 F.4th 885, 899–900 (10th Cir. 2022) (discussing the

unanimity requirement). And Mr. White provides no explanation for how a verdict on this Indictment would obscure this Court's ability to sentence. Accordingly, the Court is satisfied that the Indictment is not impermissibly duplicitous and will deny Mr. White's first motion to dismiss.

Before moving on to Mr. White's second motion to dismiss, the Court addresses Mr. White's request to prohibit the Government from introducing evidence of any alleged bribe payment made by CHS-1 to Mr. White in 2019 or 2020. *See* MTD at 5–7. The Court is unconvinced by the Government's first argument that the 2019 conduct is "inextricably intertwined with the charged offense" but satisfied with its second argument that the evidence is otherwise admissible under Rule 404(b). *See* Gov't MTD Opp'n at 3–6.

The Indictment's recounting of the 2019 bribe payment confirms that it was a separate incident from the 2024 scheme, and not inextricably intertwined. On July 17, 2024, Mr. White allegedly referenced the 2019 bribe payment of $20,000 when speaking to CHS-1 as the "last time we was trying to do something like this." *See* Indictment ¶ 26; Gov't MTD Opp'n at 4. The Indictment's interpretation of that quote as referring to the 2019 bribe supports that Mr. White viewed his conduct from five years prior as a separate arrangement—were the "last time" a reference to the previous bribe payment, he would be referring to the payment on June 26, 2024. *See* Indictment ¶¶ 27, 34. Instead, he presumably refers to the last bribery scheme, which allegedly occurred in 2019. *See id.* ¶¶ 17–26. The Court is not persuaded that a payment made five years prior, which Mr. White referred to as the "last time" they had engaged in similar conduct, is "inextricably intertwined" or part of an ongoing scheme. That is not to say whether the scheme charged here may have been hatched earlier than June 26, 2024, but nothing in the Indictment suggests that the 2019 conduct was part of the same scheme.

8

None of the Government's cited authority is to the contrary.  In *Bates*, the Fifth Circuit held that evidence of co-conspirators' conduct before the defendant joined the conspiracy, including their criminal conduct before the conspiracy began, was not extraneous.  *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979).  "Rather, the testimony was fully admissible evidence of the existence of an ongoing conspiracy as charged in the indictment" and as bearing on the existence and purpose of that conspiracy and the significance of later conduct.  *Id.*  But here, the Indictment alleges no facts connecting the 2019 incident to the 2024 scheme or supporting that any acts from 2019 were "ongoing."  *See* Indictment ¶ 69.  Similarly, in *Badru*, the evidence that "arose out of the same transaction" as the charged offense and was "necessary to complete the story" were trips the drug smugglers took to Nigeria that "coincided with occasions when [they] indicated to the undercover agent that they had new heroin to sell," before their arrest while smuggling heroin the next year.  *United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996) (quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983) (per curiam)).  Here, there is no comparable pattern or temporal connection, and the 2019 conduct was obviously not contemporaneous with the 2024 conduct.  *See United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000).

Nevertheless, the Court agrees with the Government that the evidence of the alleged 2019 bribe is admissible under Rule 404(b).  *See id.* (distinguishing the Rule 404(b) analysis from the "inextricably intertwined" analysis).  "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  But this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  In this

way, "Rule 404(b) is a rule of inclusion rather than exclusion, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2018) (cleaned up).

Here, the Government argues that evidence of the 2019 bribe tends to establish Mr. White's prior corrupt relationship with CHS-1, Mr. White's opportunity and capacity to commit the charged offense, and Mr. White's motive, intent, and lack of mistake in committing the charged offense. *See* Gov't MTD Opp'n at 9–12. The Court agrees that evidence establishing Mr. White's relationship and prior dealings with CHS-1 is probative of the context in which the 2024 bribery scheme arose. *See United States v. Straker*, 800 F.3d 570, 590 (D.C. Cir. 2015) (per curiam) ("Evidence that defendants jointly engaged in other criminal activity can be relevant to shed light on how the 'relationship of mutual trust' developed between those individuals." (quoting *United States v. Escobar-de Jesús*, 187 F.3d 148, 169 (1st Cir. 1999)). Additionally, the alleged 2019 bribe conduct is relevant to establish Mr. White's state of mind— which he disputes—including his intent and lack of mistake in his dealings with CHS-1. *See, e.g.*, 2d MTD at 4–5 ("[T]he confidential informant['s] . . . script . . . was designed to steer White into making commitments to speak with government employees about the CHS's contract. But while that was the mindset of the confidential informant, White's mindset was otherwise."). The charged offense requires the Government to prove beyond a reasonable doubt that Mr. White accepted the bribe payments "in return for being influenced" or "induced." 18 U.S.C. § 201(b)(2). Any potential doubt about the purpose of the payments from CHS-1 to Mr. White could be addressed by demonstrating that the two parties' expectations were based on their prior dealings. *See Straker*, 800 F.3d at 590 (holding that prior bad acts were admissible for non-

propensity purposes to undermine whether any of the "defendants was somehow mistakenly swept up into activities he did not know were part of a criminal conspiracy" by showing "similar criminal teamwork with some of the same people"). And though Mr. White frames his opportunity and capacity to commit the charged offense as obvious based on his position as a councilmember, Def.'s MTD Reply at 9, in other filings, he highlights that he "himself had no authority to make a decision that would affect [CHS-1's] contract," 2d MTD at 6. Thus, his ability to exert pressure on others, that is, his opportunity and capacity to do so, is relevant.

But relevance for a non-propensity purpose does not end the inquiry. The Court must also determine whether the evidence is prohibited under another rule, in this case Rule 403. *See United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002). Under Rule 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Rule 403 'does not bar powerful, or even "prejudicial" evidence. Instead, the Rule focuses on the "danger of *unfair* prejudice" and gives the court discretion to exclude evidence only if that danger "*substantially* outweigh[s]" the evidence's probative value.'" *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (alterations in original) (quoting *United States v. Gartmon,* 146 F.3d 1015, 1021 (D.C. Cir. 1998)). Here, evidence of the 2019 bribe conduct is probative for all the reasons discussed above, including for providing context on the relationship between Mr. White and CHS-1, as well as for Mr. White's state of mind and lack of mistake in dealing with CHS-1 in 2024.

Even so, Mr. White argues that the evidence should be excluded under Rule 403 because it is "highly unreliable" and "has no legitimate probative value." MTD at 7; Def.'s MTD Reply at 6–10. Relying on *Hansford v. United States*, 303 F.2d 219, 226 (D.C. Cir. 1962) (en banc), Mr. White argues that CHS-1's testimony regarding the 2019 bribe will be uncorroborated, such

11

that any prejudicial effect will substantially outweigh any probative value. *See* MTD at 6; Def.'s MTD Reply at 6–7. *Hansford* involved a prosecution for the illegal sale of heroin. Both the defendant and the government informant who allegedly bought the heroin from the defendant denied that the defendant was the seller. *Hansford*, 303 F.2d at 220. Only a police officer testified that the defendant sold the heroin to the informant. *Id.* After the defendant raised an entrapment defense, and in an attempt to overcome that defense with evidence of propensity, the government recalled the same police officer who testified that nine months earlier he had seen the defendant selling heroin. *Id.* The officer initially stated he had made a police report, but he was unable to find it later, and there was no other corroboration of his testimony. *See id.* at 220–21 & n.2. The officer apparently did not arrest the defendant at the time despite witnessing the crime. The *en banc* D.C. Circuit reversed the conviction. *Id.* at 226. It held "[i]n this particular factual situation . . . , not having been corroborated by the production of a contemporaneous report or otherwise substantially corroborated," the evidence of the prior heroin sale "was so prejudicial to the accused in his defense of the charge on trial as to outweigh the probative value of the testimony on the issue of predisposition." *Id.*

The Court concludes that *Hansford* is inapposite for two reasons. First, *Hansford* occurred in a unique situation where the risk of prejudice was aggravated by both the weakness of the government's evidence and an instructional error not present here. As a later D.C. Circuit panel explained, *Hansford*'s holding "was expressly limited to its 'particular factual situation.'" *United States v. Rippy*, 606 F.2d 1150, 1155 n.35 (D.C. Cir. 1979) (per curiam) (quoting *Hansford*, 303 F.2d at 226). In *Hansford*, the officer's uncorroborated testimony was not only the sole evidence of the prior bad act, it was the sole evidence of the crime at issue. Both the defendant *and the government's informant* denied that the defendant sold the drugs. *Hansford*,

303 F.2d at 220.  Only the officer testified that he saw the defendant sell the drugs.  *Id.*  Given the infirmity in the government's evidence at trial, the risk of unfair prejudice from a prior bad act was particularly salient.

The risk of prejudice in *Hansford* was compounded by an instructional error regarding entrapment.  The trial court had instructed the jury that a defendant claiming entrapment must be "an otherwise innocent person."  *Id.* at 221.  According to the D.C. Circuit, "[t]he jury could well believe that the defense of entrapment was available only to an innocent man, that is, a man who had no criminal record, and was enticed.  Yet that is not the law."  *Id.* at 222.  Under that understanding of the instruction, the officer's testimony about the defendant's prior bad act, if believed, would have been dispositive of the entrapment defense, as opposed to merely evidence of propensity.

Neither of these unique circumstances is present here.  To the best of its knowledge, the Court has not (yet) committed an instructional error.  And the strength of the government's evidence as presented at trial remains to be seen.  That is true even for the 2019 bribe, which Mr. White argues is uncorroborated and for which he lists a variety of reasons why a jury may not believe CHS-1's testimony.  *See* Def.'s MTD Reply at 7–8.  When the D.C. Circuit distinguished *Hansford* in *Rippy*, it emphasized that the trial court had "found some corroboration of the predisposition evidence in appellants own testimony" at trial.  606 F.2d at 1155 n.35.  To the extent Mr. White plans to testify, he has not done so yet.

Second, in this case, the probative value of the evidence is higher, and the risk of prejudice is lesser, than in *Hansford*.  For the probative value, while the prior sale in *Hansford* was relevant only to "the issue of predisposition," *id.* at 226, here it also probative of all the non-propensity issues under Rule 404(b) described above.  On the prejudice side of the balance,

unlike in *Hansford*, Mr. White has ample time to prepare to rebut the evidence of the 2019 bribe.

In *Hansford*, the court noted that "the defendant had no opportunity to prepare to defend against

this other charge and no means of combatting it, save by his own unsupported testimony in

denial of the officer's testimony." *Hansford*, 303 F.2d at 226. Here, Mr. White will have the

opportunity to impeach CHS-1 and prepare countervailing evidence, thereby reducing any

potential prejudice if the jury is asked to decide whether it finds CHS-1's testimony regarding

the 2019 conduct credible.

Because *Hansford* does not go so far as to require that all testimony of prior bad acts be

corroborated to be admissible, and because the unique circumstances from *Hansford* are not

present here, Rule 403 does not require exclusion of the 2019 bribe. In sum, the Court denies

Mr. White's first motion to dismiss and denies his request to exclude evidence of the alleged

bribe occurring in 2019.

### 2. *Motion to Dismiss Indictment for Failure to Allege an "Official Act"*

In his second motion to dismiss, Mr. White argues that the Court should dismiss the

Indictment because it fails to allege conduct that constitutes an "official act" within the meaning

of 18 U.S.C. § 201, as clarified by *McDonnell v. United States*, 579 U.S. 550 (2016). 2d MTD

at 1–4. The Government identifies multiple persuasive reasons why this argument is unavailing.

The Indictment charges Mr. White for bribery under 18 U.S.C. § 201(b)(2)(A), (B), and

(C). *See* Indictment at 1, ¶ 69. That statute provides:

(b) Whoever . . .

> (2) being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:

>> (A) being influenced in the performance of any official act;

14

> (B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
>
> (C) being induced to do or omit to do any act in violation of the official duty of such official or person;
>
> . . .
>
> shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

18 U.S.C. § 201(b)(2). In § 201, "the term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* § 201(a)(3).

The Supreme Court has clarified that this definition of "official act" has two requirements: (1) a question or matter that may be pending before a public official, and (2) whether the official "made a decision or took an action" on that question or matter, "or agreed to do so." *McDonnell*, 579 U.S. at 567. "The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so." *Id.* at 572. "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *Id.* at 572–73.

Further, "[a] public official may also make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act.'" *Id.* at 572. Though "merely setting up a meeting,

15

hosting an event, or calling another official" is not sufficient, "[i]f an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act." *Id.* at 571–73. So, "if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal." *Id.* at 573.

Mr. White does not contend that the contracts at issue would not constitute matters pending before a public official, but he disputes whether he took an action on those matters or agreed to do so. 2d MTD at 4–6. He argues that the "most that the Government will be able to prove is that White attended a single meeting with two government employees who were involved with one of the CHS's contracts," and that "[a]t no point in that meeting did White express his view on the status of the contract" or "pressure the employees on what decision they should make as to [CHS-1's] contract." *Id.* at 4.

Applying *McDonnell*, however, whether Mr. White actually performed, or even intended to perform, an official act is beside the point "so long as he agree[d] to do so." *McDonnell*, 579 U.S. at 572. The "jury could, for example, conclude that an agreement was reached if the evidence shows that [Mr. White] received a thing of value knowing that it was given *with the expectation* that [he] would perform an 'official act' in return." *Id.* (emphasis added).

Here, the Indictment alleges a promise by Mr. White to perform an official act by pressuring others to perform an official act. Mr. White parses the Indictment, trying to argue that none of the conversations between him and CHS-1 could constitute an agreement to perform an official act. *See* 2d MTD at 5–6. Accepting the truth of the factual allegations in the Indictment, the Court cannot agree that the Indictment fails to allege an agreement as a matter of law. As just one example, the Indictment alleges that on July 17, 2024, "CHS 1 offered and White [sic]

16

accepted a kickback of 3% of each grant's value in exchange for WHITE agreeing to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2."  Indictment ¶ 35.[1] Mr. White does not appear to dispute that extending a grant would constitute an official act by the ONSE and DYRS.  And, as the Supreme Court explained in *McDonnell*, "exert[ing] pressure on *another* official to perform an 'official act'" is itself an official act.  579 U.S. at 572.  Whether a jury will agree with the Government's position that Mr. White's conversations with CHS-1 reflected an agreement to pressure an official is yet to be seen, but any defect would be in the proof, not in the Indictment.  Thus, the Court disagrees that the Indictment fails to allege an agreement to perform an official act.[2]

Lastly, the parties dispute whether an official act is even necessary for the Indictment to survive.  Section 201(b)(2) has three subparagraphs—A through C—and thus sets out "three different bribery offenses."  *United States v. Paitsel*, 147 F.4th 1010, 1023 (D.C. Cir. 2025).  The

---

[1] *See also id.* ¶ 38 (alleging a conversation during which CHS-1 showed Mr. White a ledger with the value of various contracts and the corresponding 3% kickback, during which CHS-1 said, "What I was thinking with you, is, if you are able to seal this up . . . . I will give you 141[000]," to which Mr. White replied "Okay"); *id.* ¶ 39 ("WHITE then noted that Government Employee 3 was the high ranking official, and that Government Employee 3 did not know if she/he was going to be made the permanent high ranking official of the ONSE.  WHITE said: 'that's why I want to go talk to [him/her] and tell [him/her] I can be supportive of this, this and this, now this, this and this . . . I am just going to tell [him/her] I don't know how much I can be supportive if this don't happen . . . .'" (alterations in original)).

[2] Mr. White emphasizes that under *McDonnell* "expressing support" for a program is not an official act.  *Id.* at 573; 2d MTD at 5.  But, as discussed above, *McDonnell* distinguishes between "expressing support" and "exert[ing] pressure."  579 U.S. at 572–73.  Here, the Indictment alleges, among other things, that Mr. White "agree[d] to pressure the ONSE and DYRS to extend their grants to Company 1 and Company 2" as well as that Mr. White told CHS-1 that he would tell Government Employee 3 that he did not "know how much [he could] be supportive" of their ambitions "to be made the permanent high ranking official of the ONSE" "if this don't happen"—with "this" potentially referring to extending the grants to Company 1 and Company 2.  Indictment ¶¶ 35, 39.  A jury could determine that this would have amounted to a threat to withhold support and that such a threat would constitute exerting pressure on Government Employee 3 to extend the grants.

parties appear to agree that two of these subparagraphs, B and C, do not require an "official act."
*See* Gov't 2d MTD Opp'n at 2–3, ECF No. 48; Def.'s 2d MTD Reply at 1, ECF No. 60; *see also*
*United States v. Ng Lap Seng*, 934 F.3d 110, 132 (2d Cir. 2019).  Nevertheless, Mr. White argues
that an official act is required here because a "commonsense" reading of the Indictment makes
"clear that the horse that the Government is riding in this case" is § 201(b)(2)(A), which requires
an official act.  Def.'s 2d MTD Reply at 1.  At the hearing on these motions, the Government
explained its position that subparagraph B regarding fraud is in play because the Indictment
alleges that ONSE, one of the entities that awarded contracts to CHS-1's companies, receives
federal funding.  Indictment ¶ 8.  And the Government also explained that subparagraph C is in
play because the Indictment sets out Mr. White's official duties as a Councilmember, and that he
violated those duties in his interactions with CHS-1.  *Id.* ¶¶ 2, 4, 69.  Though the Court agrees
that subparagraph A appears to be the most applicable type of bribery at issue here, the Court is
satisfied that the Government has at least alleged all three theories of bribery and accordingly
denies Mr. White's second motion to dismiss.

### B.  Government's Motions *in Limine*

The Government's first omnibus brief asks the Court to preclude Mr. White from
presenting eight kinds of argument and evidence at trial and allow the case agent to sit at counsel
table.  Specifically, the Government asks the Court to

> (A) preclude Mr. White from presenting jury-nullification arguments to the jury;
> (B) preclude Mr. White from presenting selective-prosecution arguments to the jury;
> (C) preclude Mr. White from referring to punishment or other consequences;
> (D) preclude Mr. White from offering evidence of prior good conduct;
> (E) preclude the use of self-serving hearsay;
> (F) limit cross-examination of CHS-1 and exclude evidence of CHS-1's irrelevant criminal cases;
> (G) preclude Mr. White from presenting an entrapment defense;
> (H) preclude Mr. White from impeaching witnesses with interview reports; and

(I) allow the case agent to sit at counsel table during the trial.

Gov't Reply in Supp. Omnibus Mots. *in Lim.* ("Gov't Omnibus Reply") at 1, ECF No. 27 (reformatted). Mr. White largely opposes these motions, with certain exceptions discussed below. *See* Def. Omnibus Opp'n, ECF No. 26. The Government has also filed two motions asking the Court to find that certain business records and forensically extracted cellphone data are self-authenticating under Federal Rule of Evidence 902. Gov't 2d MIL at 1, ECF No. 29; Gov't Suppl. MIL at 1, ECF No. 38. Neither Mr. White's past nor present counsel has opposed these motions. The Court addresses each issue in turn.

### 1. *Jury-Nullification Arguments*

The D.C. Circuit has rejected the idea that, "in a society committed to the rule of law, courts may permit jury nullification of the law to occur when it is within their authority to prevent." *United States v. Wilkerson*, 966 F.3d 828, 835 (D.C. Cir. 2020) (cleaned up) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)); *United States v. Gorham*, 523 F.2d 1088, 1097–98 (D.C. Cir. 1975). The Government moves to preclude the introduction of argument or evidence that encourages the jury to nullify its verdict. Gov't Omnibus MIL at 17–18. Mr. White does not challenge the Government's articulation of the law; his only response is that the Government's request "essentially amount[s] to asking the Court to require that defense counsel follow the rules of evidence." Def. Omnibus Opp'n at 1. Because the parties agree that jury-nullification arguments are impermissible, the Court grants the Government's motion to preclude them. *See In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) (holding that district courts have a duty to prevent counsel from arguing nullification).

19

### 2. Selective-Prosecution Arguments

The Government moves to preclude Mr. White from making arguments about selective prosecution to the jury. Gov't Omnibus MIL at 18–19. "[T]he issue of selective prosecution is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which [ ]he was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (per curiam) (citations omitted). Because issues of selective prosecution "are legal matters for the Court, not theories of defense for the jury," courts grant motions *in limine* precluding these arguments from being raised to the jury. *See, e.g.*, *United States v. Fuller*, No. 23-cr-209, 2024 WL 4880497, at *10 (D.D.C. Nov. 25, 2024) (quoting *United States v. Safavian*, No. 05-cr-370, 2008 WL 5255534, at *1 (D.D.C. Dec. 12, 2008)). Mr. White, again, does not challenge the Government's articulation of the law. *See* Def. Omnibus Opp'n at 1. Because the parties agree that selective-prosecution arguments are inappropriate for the jury, the Court grants the Government's motion to preclude them.

### 3. References to Punishment or Consequences of Verdict

"In non-capital cases, fixing punishment is not the function of the jury; rather, the jury's sole function is to ascertain guilt or innocence. Hence, the jury is not to consider the potential punishment which could result from a conviction." *United States v. Broxton*, 926 F.2d 1180, 1183 (D.C. Cir. 1991) (per curiam) (citation omitted); *see United States v. Manning*, 79 F.3d 212, 219 (1st Cir. 1996) ("An attorney's attempt to achieve the same end [as nullification] indirectly, by arguing the severity of the punishment to the jury, is equally impermissible."). Accordingly, the Government moves to preclude Mr. White from referencing potential consequences of a guilty verdict. Gov't Omnibus MIL at 19–20. On this issue, too, Mr. White

20

does not contest the Government's articulation of the law but maintains that the request is premature. Def. Opp'n at 1. Because the parties agree that the potential punishment or consequences of Mr. White's verdict are irrelevant to the jury's determination of guilt, the Court grants the Government's motion to preclude references to those issues.

### 4. *Evidence of Mr. White's Prior Good Conduct*

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). But a defendant in a criminal case "may offer evidence of the defendant's pertinent trait." Fed. R. Evid. 404(a)(2)(A). The Government moves to preclude argument or evidence regarding Mr. White's prior good conduct, arguing that "any potential purported prior good acts are not relevant to any character trait that is 'pertinent' to any of the charges against him." Gov't Omnibus MIL at 20–21. Mr. White responds that he "retains the right to introduce all evidence that complies with the Federal Rules of Evidence including any prior good conduct." Def. Omnibus Opp'n at 2. But Mr. White does not identify any pertinent trait that would justify the admission of prior good conduct. Even so, the Court will deny the Government's request. As the Court explained at the hearing on these motions, if Mr. White would like to introduce evidence of prior good conduct, he must include the witness or other evidence in the Joint Pretrial Statement and explain why he wants to introduce the evidence, including what pertinent trait the testimony supports. *See* Hr'g Tr. at 14:11–15. Otherwise, this evidence may be inadmissible under Rule 404(a).

### 5. *Introduction of Self-Serving Hearsay*

The Government moves to preclude Mr. White from introducing "self-serving hearsay" at trial. Gov't Omnibus MIL at 23. Hearsay is an out-of-court statement that "a party offers in

evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "While the Federal Rules of Evidence set forth various exceptions to hearsay, self-serving hearsay is not one of those." *United States v. Wilkins*, 538 F. Supp. 3d 49, 68 (D.D.C. 2021). Mr. White finds the Government's request "perplexing" and assures the Court that "counsel for Mr. White is well aware that any out of court statement offered for the truth of the matter asserted must comply with the Rules of Evidence concerning hearsay statements." Def. Omnibus Opp'n at 2. The parties appear to agree on this issue as a legal matter, so the Court will grant the request in part. Mr. White is generally prohibited from introducing self-serving hearsay statements, subject to any necessary fact-specific determinations that arise during trial related to any exceptions to that rule.

### 6. *Cross-Examination Related to CHS-1's Other Criminal and Civil Cases*

The Government asks the Court to "limit cross examination into CHS-1's prior or active criminal and civil cases" outlined in the Government's Sealed Exhibit 4, with the exception of "the case where he pleaded guilty in connection with this case."[3] Gov't Omnibus MIL at 21–22; Gov't Omnibus Reply at 2. Mr. White finds the "government's effort to limit cross examination of its primary witness . . . particularly egregious," and asserts that he may "introduce any extrinsic evidence relevant to CHS-1's character for truthfulness or untruthfulness which may include the conduct described in Sealed Exhibit 4." Def. Omnibus Opp'n at 3.

---

[3] With its omnibus motion *in limine*, the Government moved for leave to file Exhibit 4 under seal. ECF No. 25. Mr. White has filed no brief in opposition. Upon consideration of the Government's motion, and the factors articulated in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), the Court grants the motion.

Fed. R. Evid. 608 governs the admissibility of this evidence.[4]  Under Rule 608, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Fed. R. Evid 608(b); *see United States v. O'Neal*, 844 F.3d 271, 277 (D.C. Cir. 2016).  This rule, however, comes with both an important qualification and a notable exception.  First, the prohibition applies only to evidence used "in order to attack or support the witness's *character for truthfulness*."  Fed. R. Evid 608(b) (emphasis added).  Thus, extrinsic evidence may be admissible for other purposes, such as to demonstrate bias, impeachment, or contradiction.  *See United States v. Moore*, No. CR 25-162 (BAH), 2026 WL 485282, at *5 (D.D.C. Feb. 20, 2026); Fed. R. Evid. 608(b) advisory committee's notes to 2003 amendments.  Second, although extrinsic evidence of truthfulness is barred, "the court may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into if they are probative of the character of truthfulness or untruthfulness" of the witness.  Fed. R. Evid. 608(b).  "In considering whether a topic is probative of untruthfulness, the district court 'is guided by several factors, including whether the instances of prior untruthfulness bore some similarity to the conduct at issue, whether or not they were remote in time, whether they were cumulative of other evidence, and whether there was some likelihood

---

[4] The Court acknowledges that Rule 609 can require the admission of certain criminal convictions.  *See* Fed. R. Evid. 609.  But Mr. White does not argue that any of the evidence outlined in the Government's Sealed Exhibit 4 is admissible under Rule 609, so the Court deems such an argument forfeited.  *See McNeil v. District of Columbia*, 233 F. Supp. 3d 150, 157 n.11 (D.D.C. 2017) (finding arguments not adequately raised by the parties to be waived).  At any rate, it appears that the only criminal conviction at issue—"Stopping Vehicle in Intersection"—is neither punishable by death or imprisonment for over a year (as required by Rule 609(a)(1)) or a *crimen falsi* (as required by Rule 609(a)(2)).  *See* Md. Code Ann. Transp. § 21–1003(d) (West 2017).  Although the Court notes that neither party has provided the statute under which CHS-1 was charged.

they happened.'"  *United States v. Miller*, 738 F.3d 361, 376 (D.C. Cir. 2013) (quoting *United States v. Simonelli*, 237 F.3d 19, 23 (1st Cir. 2001)).

The Court agrees with the Government that, under the straightforward application of Rule 608(b), Mr. White may not introduce *extrinsic evidence* of the civil and criminal cases contained in the Government's Sealed Exhibit 4 to prove CHS-1's character of truthfulness or untruthfulness.  It is unclear whether Mr. White even contests this.  *See* Def. Omnibus Opp'n at 3–4.  He briefly states that he "may . . . introduce any extrinsic evidence relevant to CHS-1's character for truthfulness or untruthfulness," *id.* at 3, but that statement is at odds with both the argument in his brief and the text of Rule 608.

Instead, the parties' dispute focuses on whether Mr. White may cross-examine CHS-1 about—or "inquire[ ] into," Fed. R. Evid. 608(b)—the criminal and civil cases.  *See* Def. Omnibus Opp'n at 3–4; Gov't Omnibus Reply at 2–5.  As the Government points out, Mr. White advances no specific argument as to why cross-examination of CHS-1 about the matters referenced in Sealed Exhibit 4 would be "probative of [CHS-1's] character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b); *see* Def. Omnibus Opp'n at 3–4.  Here, most of the matters catalogued in Sealed Exhibit 4 have either been dismissed or remain on-going.  The D.C. Circuit has upheld a trial court's decision to preclude cross-examination under Rule 608(b) "on the ground that the mere *filing* of a complaint is not 'probative of truthfulness or untruthfulness.'"  *United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996).  *But cf. United States v. Whitmore*, 359 F.3d 609, 621 (D.C. Cir. 2004) (noting that *Morrison* "did not address what difference it might have made had the defendant sought to cross-examine the witness about the *substance* of the complaint").

Nevertheless, the Court is reticent to limit the cross-examination of CHS-1 about these matters *at this stage*. Mr. White's ability to cross-examine CHS-1, a key government witness, likely implicates Mr. White's constitutional right to confront the witnesses against him. *See* U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). Although Mr. White did not explain why inquiry into these matters would be probative in his opposition, the Government offers little in the way of argument that the evidence is *not* probative, and neither party addresses who bears the burden of persuasion. *See* Def. Omnibus Opp'n at 3–4; Gov't Omnibus Reply at 2–5. Moreover, the Court notes that Mr. White has substituted counsel since filing his opposition. At the same time, the Court is mindful that the Government should not be "forced to wait until [the defense] beg[ins] to question" CHS-1 about the evidence in Sealed Exhibit 4 before it can object. Gov't Omnibus Reply at 3.

Accordingly, the Court will grant the Government's request in part. Mr. White is precluded from using extrinsic evidence of the matters in Sealed Exhibit 4 "to attack or support [CHS-1's] character for truthfulness." Fed. R. Evid. 608(b). If Mr. White intends to cross-examine CHS-1 with inquiry into conduct related to his criminal and civil cases outlined in Sealed Exhibit 4 to attack CHS-1's character for truthfulness or untruthfulness, then Mr. White must indicate which matters he wishes to inquire into and proffer a reason why the conduct is probative of CHS-1's character for untruthfulness, in the Joint Pretrial Statement. Similarly, if Mr. White seeks to either introduce extrinsic evidence about the matters in Sealed Exhibit 4 or inquire into them for reasons *other than* to "attack or support [CHS-1's] character for truthfulness," *id.*, he must also proffer the basis for doing so in the Joint Pretrial Statement— unless the basis for the questioning or admissibility, such as contradiction, arises during trial. If

25

the basis for admissibility arises only amidst the trial, Mr. White must still proffer a reason for why the evidence is admissible outside the presence of the jury.

### 7.  *Entrapment Defense*

The Government moves to preclude Mr. White from making any argument or introducing evidence suggesting that he was entrapped by law enforcement.  *See* Gov't Omnibus MIL at 10–17.  But as Mr. White's new counsel has explained, his best evidence of entrapment may come from the cross-examination of CHS-1 at trial.  *See* Supp. Opp'n by Trayon White to Gov't's Mot. *in Limine* to Preclude Entrapment Defense ("Def.'s Suppl. Opp'n to Entrapment MIL") at 5–6, ECF 43.  The Court agrees with Mr. White that on the facts of this case, the Government's request is premature and should be denied.

"Under the law of entrapment in this circuit, 'once a defendant meets his burden of proving that the government persuaded him to commit a crime, the government must prove beyond a reasonable doubt that the defendant was ready and willing to do so.'"  *United States v. McKinley*, 70 F.3d 1307, 1309 (D.C. Cir. 1995) (quoting *United States v. Whoie*, 925 F.2d 1481, 1485 (D.C. Cir. 1991)).  "[A] defendant only 'is entitled to an entrapment instruction when[ ] there is sufficient evidence from which a reasonable jury could find entrapment.'"  *Id.* (second alteration in original) (quoting *Mathews v. United States*, 485 U.S. 58, 62 (1988)).  That burden is not high: "Once the defendant has met the burden of showing 'that there is *some* evidence' of government inducement, the burden shifts to the government to disprove entrapment by demonstrating beyond a reasonable doubt that the defendant was predisposed to commit the crime."  *United States v. Budd*, 23 F.3d 442, 445 (D.C. Cir. 1994) (quoting *United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984)).  "The government's behavior amounts to inducement when it was 'such that a law-abiding citizen's will to obey the law could have been overborne.'"

26

*United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998) (quoting *Kelly*, 748 F.2d at 698).

Government inducement may include "persuasion, fraudulent representations, threats, coercive

tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship."

*United States v. Williamson*, 903 F.3d 124, 132 (D.C. Cir. 2018) (quoting *United States v.*

*Sanchez*, 88 F.3d 1243, 1249 (D.C. Cir. 1996) (overruled in part on other grounds)).[5]

At the hearing on these motions, Mr. White's counsel made clear that the defense has not

determined whether they will rely on a theory of entrapment at trial and suggested that the

viability of that defense will likely depend on CHS-1's testimony regarding his relationship with

Mr. White. *See* Hr'g Tr. at 10:6–11:9; Def. Omnibus Opp'n at 4 (arguing that "whether the

defense has presented sufficient evidence to warrant an entrapment instruction is an appropriate

question at the charge conference, not for a motion in limine"). Mr. White's reliance on a plea to

friendship seems consistent with the text messages Mr. White highlighted in his briefing,

including texts from CHS-1 to Mr. White referring to Mr. White as "big brother" and telling him

that he "really need[ed] to see" Mr. White. *See* Def.'s Suppl. Entrapment Reply at 3.

Importantly, the Government concedes that not every phone conversation between Mr. White

and CHS-1 was recorded. *See id.* at 6; Hr'g Tr. at 6:19–7:6. Though the Government's position

---

[5] A plea to friendship or for sympathy involves someone overcoming the defendant's willingness to follow the law by invoking their duty of friendship and sympathy for the inducer. *See Sherman v. United States*, 356 U.S. 369, 371, 373–74 (1958) (reversing conviction based on entrapment defense where an informant persuaded the defendant to purchase narcotics for him only after multiple conversations invoking their "mutual experiences" with drug addiction and repeated requests "predicated on [the informant's] presumed suffering"); *see also id.* at 383 (Frankfurter, J., concurring in the judgment). For example, the Seventh Circuit has held that when a government informant "traded on [the defendant's] insecurities"—a friend who had been characterized as a "loner" and had confessed experiencing "social anxiety"—to convince the defendant to download child porn for the informant, there was sufficient evidence to instruct the jury on entrapment due to a plea of friendship. *United States v. McGill*, 754 F.3d 452, 459 (7th Cir. 2014). The D.C. Circuit, however, has "yet to find" a plea to friendship strong enough for entrapment. *United States v. Solofa*, 745 F.3d 1226, 1230 (D.C. Cir. 2014).

is that none of those unrecorded conversations was substantive, *id.*, the Court concludes that Mr. White should have the opportunity to elicit testimony that allows the jury to draw different inferences, which may be relevant to an entrapment defense.

The parties have not cited any D.C. Circuit authority addressing the propriety of a pretrial motion *in limine* to exclude argument relating to an entrapment defense. The Government primarily relies on Seventh Circuit authority on this point. *See* Gov't Omnibus Reply at 4. In the Seventh Circuit, "[e]ntrapment is usually an issue for a jury, but it can be addressed as a matter of law before trial if the defendant is unable to provide sufficient evidence that a rational jury could infer that the defendant had been entrapped." *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012). In conducting this analysis, the Seventh Circuit has held that "the court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it." *United States v. Mayfield*, 771 F.3d 417, 440 (7th Cir. 2014) (en banc). To administer this rule, that Circuit has approved of district courts "limit[ing] the scope of the trial by excluding the [entrapment] defense until" the defendant makes "a sufficient showing or proffer of entrapment" such that the defense may be presented to the jury. *See United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999). The First Circuit has also affirmed in a case involving a similar procedure. *See United States v. Rivera-Ruperto*, 846 F.3d 417, 427–31 (1st Cir. 2017) (finding the district court did not err in denying the defendant an opportunity to present his entrapment defense to the jury, including in opening statements, where the defendant failed to make an adequate evidentiary proffer prior to trial).

But, as Mr. White's new counsel points out, his best evidence of entrapment may come from cross-examining CHS-1. Def.'s Suppl. Opp'n to Entrapment MIL at 5–6. Like in *Triplett-Armstrong*, where the court deferred ruling on entrapment pretrial, not every interaction between

Mr. White and CHS-1 was recorded. *See United States v. Triplett-Armstrong*, No. CR-22-91-RAW, 2023 WL 2018577, at *2 (E.D. Okla. Feb. 15, 2023). Thus, to the extent Mr. White will rely on his relationship with CHS-1, CHS-1's "testimony at trial is essential to making any determination" regarding his potential entrapment defense. *See id.* Of course, counsel does not have an opportunity to interview CHS-1 before trial to develop such evidence of entrapment. As the Tenth Circuit has explained, whether to submit entrapment to a jury "typically arises at the conclusion of a trial, when a district judge must decide if adequate evidence has been presented to warrant an entrapment instruction." *United States v. Fadel*, 844 F.2d 1425, 1430 (10th Cir. 1988); *see also id.* ("The vast majority of courts which have considered the issue have *not* favored the pretrial resolution of entrapment defense motions." (collecting cases)). And while the Seventh Circuit has deemed pretrial resolution of the entrapment defense as "permissible" where the defendant fails to proffer evidence of inducement, it has left open the possibility that, in certain circumstances, the defendant may raise the defense "at trial." *See Mayfield*, 771 F.3d at 439 n.5, 440–441; *United States v. Santiago-Godinez*, 12 F.3d 722, 730 (7th Cir. 1993) ("As we have noted, *under limited circumstances*, the district court may decide prior to trial that a defendant is unable to produce sufficient evidence of entrapment to entitle him to present that defense to the jury. (emphasis added)).

One benefit of a pretrial proffer on entrapment is that it helps the parties understand the scope of trial, including whether the defendant's predisposition will be at issue. But the Court is persuaded that Mr. White should not have to decide at this juncture whether he will rely on an entrapment defense before having the opportunity to cross-examine CHS-1. *See United States v. Aguilar*, No. 07-cr-0030, 2007 WL 4219370, at *3 (N.D. Cal. Nov. 28, 2007) (rejecting similar arguments based on *Santiago-Godinez* that pretrial resolution of an entrapment was appropriate).

Moreover, the Court was not satisfied with the Government's explanation of how Mr. White would be able to elicit such testimony if he were not allowed to mention or suggest the entrapment defense in front of the jury.  *See* Gov't Omnibus MIL at 17 n.2; Gov't Omnibus Reply at 5; Hr'g Tr. at 4:11–7:12.  So the Court will deny this motion.

That said, what's sauce for the goose is sauce for the gander.  If Mr. White intends to wait until trial to make an evidentiary proffer on his entrapment defense, as the Court holds he is entitled to do, then he should not be surprised if the Government seeks to notice predisposition evidence at that time, albeit outside the presence of the jury.  *See* Hr'g Tr. at 37:8–22.  And as discussed below, if Mr. White desires pretrial notice of predisposition evidence—which would only be relevant if he raises an entrapment defense—then he should make a pretrial evidentiary proffer on that defense.

### 8.  *Impeaching Witnesses with Interview Reports*

The Government moves to preclude the introduction of FBI witness reports to impeach witnesses who neither wrote nor reviewed those reports.  Gov't Omnibus MIL at 22–23.  This appears consistent with Rule 613, which applies only to a witness's own prior statement.  *See* Fed. R. Evid. 613.  At the hearing on these motions, Mr. White's counsel clarified that while the FBI reports would not be used to impeach CHS-1, the FBI agents who drafted the reports should be available to testify if CHS-1's testimony deviates from that in the reports.  Hr'g Tr. at 11:23–12:1.  The government agreed that the appropriate procedure for impeaching CHS-1 in that situation would be for the defense "to call the person . . . who was present and can testify" to CHS-1's previous statement.  *Id.* at 13:13–14.  Thus, the parties agree on this issue, and the Court will grant the request.  The reports will not be admitted to impeach CHS-1, but the agents

who drafted the reports will be available to testify if CHS-1's testimony substantially deviates from the reports.

### 9. *Case Agent's Presence During Trial*

The Government requests to have a case agent who will testify present in the courtroom throughout the trial. Gov't Omnibus MIL at 23–24. Mr. White does not oppose this request. Def. Omnibus Opp'n at 1 n.1; Hr'g Tr. at 40:9–11. The Court will accordingly grant the request.

### 10. *Self-Authenticating Evidence*

The Government's second motion *in limine* asks the Court to find that certain business records and forensically extracted cellphone data are self-authenticating under Rules 901 and 902, and includes certifications pursuant to Rules 902(11), (13), and (14). Gov't 2d MIL at 1; Exs. A–B, ECF No. 29-1. The Government's supplemental motion *in limine* incorporates its second motion *in limine* and seeks to authenticate additional business records and extracted data from CHS-1's cell phone under those same rules with additional certificates of authenticity. Gov't Suppl. MIL at 1, ECF No. 38. Mr. White does not oppose these motions. *See* Hr'g Tr. at 40:11–16. The Court finds that the business records and cellphone data are self-authenticating under Rule 902 and grants the motions.

### C. Defendant's Motions *in Limine*

Mr. White has filed two motions *in limine* of his own, one seeking to preclude the Government from introducing evidence of prior bad acts or predisposition evidence that has not been noticed, Def.'s MIL, ECF No. 41, and the other seeking to preclude any evidence of Mr. White's gambling at trial, Def.'s 2d MIL, ECF No. 42. The Court agrees with the Government that the first motion is premature, but the Court will set a date by which the Government should provide notice of any bad acts it plans to introduce under Rule 404(b). The

31

Court also agrees with Mr. White that the introduction of gambling evidence may be prejudicial, but the Court ultimately concludes that unless Mr. White is willing to stipulate to whether he received, kept, and spent the money he was handed by CHS-1 in the videos of their encounters, then the evidence of gambling expenditures is highly probative and will be admissible. *See* Fed. R. Evid. 403.

### 1. Unnoticed "Bad Act" and Predisposition Evidence

Mr. White moves to preclude the introduction of any evidence of bad acts or predisposition that the Government has not noticed. Def.'s MIL at 1. "Evidence of any other crime, wrong, or act . . . may be admissible" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2). But "in a criminal case, the prosecutor must provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). The Government must do so "in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice." Fed R. Evid. 404(b)(3)(C).

Mr. White argues that the time to notice any "bad act" or predisposition evidence "has passed." Def.'s MIL at 3. The Court disagrees. Trial in this case is currently set for September 2026, so pretrial notice of any "bad act" evidence can still be given with time for Mr. White to have "a fair opportunity" to counter it. *See* Fed. R. Evid. 404(b)(3)(A). As the Court explained at the hearing on these motions, it will provide a deadline for the Government to notice other "bad acts" evidence it intends to introduce at trial, including any evidence related to the five topics discussed by Mr. White in his briefs. *See* Hr'g Tr. at 24:18–19; Def.'s MIL Reply at 5, ECF No. 57 (raising concerns of evidence involving travel expenditures, campaign contributions,

bribes, and other acts).  The Court will order that this evidence be noticed no later than July 27, 2026, which will give Mr. White ample opportunity to note any objection in the Joint Pretrial Statement to be filed on or before August 10, 2026.

That said, if Mr. White chooses not to proffer evidence of entrapment prior to trial, then his predisposition may not be at issue.  *See, e.g.*, *United States v. McGuire*, 808 F.2d 694, 696 (8th Cir.1987) (per curiam) (holding that "it was error for the district court to allow the government to introduce rebuttal evidence in its case-in-chief in anticipation of an entrapment defense that was proposed, but that never actually materialized" during trial).  In that case, the Government need not notice evidence that it would notice solely for predisposition purposes. *See* Hr'g Tr. 36:16–37:22; *United States v. Burkley*, 591 F.2d 903, 921 (D.C. Cir. 1978) (explaining that after the defense raised entrapment, predisposition "became in effect an essential element of the crimes charged"); *United States v. Sonntag*, 684 F.2d 781, 788 (11th Cir. 1982) (holding that the prosecution's failure to disclose evidence of "similar acts" under Rule 404(b) did not render the evidence inadmissible where the "evidence was offered to prove predisposition of [the defendant] after he had raised the entrapment defense").  And as discussed above, should Mr. White wait until trial to put his predisposition at issue, then the Government will have the opportunity to notice predisposition evidence out of the presence of the jury at that juncture.

### 2. *Evidence Relating to Gambling*

Mr. White also seeks to preclude any evidence related to his gambling "as non-probative and unduly prejudicial" under Rules 403 and 404.  Def.'s 2d MIL at 1.  Specifically, Mr. White argues that "the gambling evidence plays prejudicially on class stereotypes and other prejudicial preconceptions" and also "suggest[s] funding from other illegal sources." *Id.* at 1–2.  The

33

Government responded at the hearing on these motions that the gambling evidence was necessary "to show that the defendant was given money, accepted the money, kept the money, and never gave it back," and that "he did not have an opportunity to give it back because he spent it at the casino."[6]  Hr'g Tr. at 31:12–16, 32:1–4.  So long as Mr. White disputes whether he kept or spent the money, this evidence would certainly be relevant under Rule 401.

Mr. White disputes the probative value of the gambling expenditures because the Government has not tied the dollar bills spent at the casinos to those handed to Mr. White by CHS-1 in the videos recording the bribe payments.  *See* Def.'s 2d MIL at 3, 5.  But the Government has represented that it has evidence documenting Mr. White spending substantial amounts of money on chips at a casino shortly after receiving the envelopes of cash from CHS-1.  *See* Gov't Not. Correct Prior Filing, ECF No. 61 (showing purchases of thousands of dollars of chips purchased by Mr. White within 48 hours after receiving each of the four bribe payments).

While the Court agrees with Mr. White that this information alone is not analogous to cases in which "a defendant suddenly receiv[ed] unexplained wealth," *see* Def.'s 2d MIL Reply at 4, at the hearing, the Government represented that it has evidence that on the relevant dates, Mr. White's bank account balance would have been insufficient to purchase the amount of chips he bought, suggesting that those purchases were not made with legitimate funds, *see* Hr'g Tr. at 32:5–33:5.  For example, the Government represented that on June 27 and 28, 2024, Mr. White purchased $5,800 worth of chips, but as of June 26, he only had $78.21 in his bank account.  *See id.* at 32:14–17; Gov't Not. Correct Prior Filing at 2.  Thus, Mr. White spending

---

[6] Because whether Mr. White kept or spent the money, as opposed to returned the money, is "part of the crime charged," it is intrinsic to the crime, and Rule 404(b)'s prohibition on "other crime, wrong, or act[s]" is inapplicable.  *See United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010).

$5,800 shortly after he received $15,000 in cash from CHS-1 is probative, though not definitive, evidence that Mr. White did not return the money, because he had spent it gambling. *See* Gov't Not. Correct Prior Filing at 2. How Mr. White spent the money is not relevant, but the Government is not required "to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *See United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998). To the extent Mr. White puts at issue what happened to the money he was handed, the prosecution has a right to tell that part of the story. *See id.*; *United States v. Loza*, 764 F. Supp. 2d 55, 59 (D.D.C. 2011) ("Once defense counsel opens the door the evidence's probative value may be enhanced such that it outweighs its prejudicial effect." (cleaned up)).

Given the probative value of this evidence, the Court disagrees that any risk of unfair prejudice substantially outweighs that value. The Court acknowledges the potential for "inflaming moral prejudice" against Mr. White for his gambling. *See United States v. Cooper*, 286 F. Supp. 2d 1283, 1291 (D. Kan. 2003). And the Court accepts that the stigma may be higher when the gambling conduct involves a public official. *See* Def.'s 2d MIL Reply at 7. But Rule 403 "tilts, as do the rules as a whole, toward the admission of evidence in close cases." *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984). Because whether Mr. White kept and did not return the cash he received is an essential element of the Government's bribery charge, the probative value of how he may have spent that money is high, and it is not substantially outweighed by the risk of prejudice. Moreover, potential jurors' anti-gambling sentiments can be probed during voir dire. Accordingly, the Court denies Mr. White's motion to preclude evidence of his gambling.

## V.  CONCLUSION

For the foregoing reasons, the Government's Omnibus Motions *in Limine* (ECF No. 24) are **GRANTED in part and DENIED in part**; the Government's Motion for Leave to File Under Seal (ECF No. 25) is **GRANTED**; the Government's Unopposed Motions *in Limine* to Authenticate Certain Evidence (ECF Nos. 29, 38) are **GRANTED**; Defendant's Motions to Dismiss the Indictment (ECF Nos. 39, 40, 44) are **DENIED**; and Defendants' Motions *in Limine* (ECF Nos. 41, 42) are **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 15, 2026                                            RUDOLPH CONTRERAS
                                                               United States District Judge