**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No: 1:24-cr-00406-RC |
| | ) | |
| Plaintiff, | ) | JUDGE RUDOLPH CONTRERAS |
| | ) | |
| vs. | ) | |
| | ) | |
| TRAYON WHITE, SR., | ) | |
| | ) | |
| Defendant. | ) | |

**TRAYON WHITE'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 29(a)**

Defendant Trayon White, Sr., through undersigned counsel, respectfully files this Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29(a) ("Rule 29 Motion"), renewing counsel's oral motion on September 20, 2026. In support of his Rule 29 Motion, Mr. White incorporates his oral arguments, asks this Court to consider all the files and records of this case, and argues as set forth below.

## INTRODUCTION

With the testimony, audio and video evidence, and text communications admitted at trial, the Government has not adduced proof that a reasonable juror could find shows beyond a reasonable doubt that Mr. White committed federal bribery. Of the many different threads within the FBI's hastily contrived sting operation staged against Mr. White with a Confidential Informant, none of them played out during the seven weeks of the undercover operation sufficiently to meet the elements of bribery. By the day of an internal Justice Department deadline to take Mr. White down before his 2024 election contest, Mr. White had neither accepted cash for a prohibited purpose under the federal bribery law, nor was there an additional bribery agreement acted upon for other amounts. The Government's only hope for a conviction

is for the judge and jury to mash all of the recorded conduct together quite indiscriminately, rather than perceiving what the evidence at trial really showed as to each thread.

Crucial to this Rule 29 Motion are the contours of the single federal bribery count charged in this case, which contains multitudes of sub-theories, and yet still has boundaries that are important for this Court to bear in mind. Mr. White was charged with taking four payments, in a quid pro quo for three different purposes – one of which splits further into three more purposes of committing ethical violations as a D.C. councilmember. The complexity does not stop there, because in addition to the $35,000 cash payments received, Mr. White allegedly agreed with the Confidential Informant, Allieu Kamara, to receive another $156,000 as part of a deal for 3% of all contracts Mr. White could get rolled over into the next fiscal year.

As to the cash delivered to Mr. White on four separate occasions referenced in the Indictment, the evidence is resounding that none of these were part of a *quid pro quo.* Instead, no reasonable juror's eyes and ears could miss how Kamara thrust the unsolicited cash on Mr. White without any prior understanding of what it was for, at most asked that Mr. White look into the status of Kamara's contracts after taking the cash, and explained a later payment as a "thank you" -- also known as a gratuity. This thread of the FBI's vaguely-planned operation, allegedly to have Kamara "act natural" with Mr. White, results in no conviction under any of the five sub-theories, for any of the four payments.

Both this cash that was in fact given, and the supposed 3% agreement in future proceeds for Mr. White successfully extending the contracts, fail the test for corrupt intent set forth in last week's decision by the D.C. Circuit, namely, that Mr. White need to have had the specific intent that, in exchange for the thing of value, **he intended to be influenced to act in the prohibited ways.** In addition, there was a failure of proof beyond a reasonable doubt that there was an

agreement as to the 3% kickback, and an abject failure of proof that Mr. White took **any** step in furtherance of this supposed agreement for 3%, including accepting any promised 3% money.

One thing is quite simple about this case – the charge against Mr. White only concerned particular contracts with two D.C. agencies, not various other contracts or possible contractual opportunities that the Government has now tried to throw into the hopper for conviction. The Government cannot now ask the jury to convict on facts regarding Medicaid contracting and other unspecified U.S. Federal contracting possibilities, after giving no support to the proposition that they were intrinsic to the D.C. scheme for violence intervention contracting charged in Count One, or properly noticing them and arguing for their admission as evidence of motive and opportunity under Rule 404(b) of the Federal Rules of Evidence. This is just an effort to put the juror's deliberations into a dizzying spin-cycle where, in the absence of unanimity, they can all pin the label of corruption on Mr. White without even one single theory lining up properly.

Therefore, for the reasons set forth further below, even with the high standard that applies, this Court should grant the motion for judgment of acquittal.

## PROCEDURAL BACKGROUND

On September 5, 2024, Councilmember White was indicted for Bribery under 18 U.S.C. § 201(b)(2)(A), (B), and (C) (Count One). *See* Indictment, ECF 12. The Government alleges that Councilmember White "corruptly demanded, sought, received, accepted, and agreed to receive and accept approximately $156,000, and received and accepted $35,000 in the form of four cash payments in exchange for using his position as a D.C. Councilmember to assist Company 1 and Company 2 extend their contracts at the ONSE and DYRS for VI Services." Indictment at 29–30, ECF 12.

The alleged purposes of these payments were various. They were allegedly in return for: (1) "being influenced in the performance of an official act," under § 201(b)(2)(A); (2) "being influenced to commit and to aid in committing," etc., "any fraud," etc., on the United States, under § 201(b)(2)(B); and (3) for being induced to do and omit to do any act in violation of official duty, of which the Government identified six, under § 201(b)(2)(C). Jumping ahead, this Court has already trimmed down this third layer of its single count from six to three theories identified in Paragraph 2 of the Indictment, namely that Mr. White:

- used his position to influence the outcome of a matter that he knows is likely to have a direct effect on his financial interests — GEX 1 (redacted version), D.C. Council Code of Conduct, Period 25, p. 2, I(a)
- received anything of value in return for being influenced in the performance of official acts — Id. *at p.10, III(e)(2)*
- disclosed or used confidential or privileged information acquired by their position without authorization — *Id. at* p.19, VII(1)

In support of Count One, the Government alleged that there were four payments as part of the "Bribery Scheme": "Bribe Payment 1 – June 26, 2024"; "Bribe Payment 2 – July 17, 2024"; "Bribe Payment 3 – July 25, 2024"; and "Bribe Payment 4 – August 9, 2024." *Id.*

The Government alleged starting at Paragraphs 37 and 38 of the Indictment that, on the same day as Bribe Payment 2, Kamara and Mr. White agreed to an additional 3% if Mr. White "sealed up" extensions of the two D.C. contracts for violence intervention. No other contracts appear in the 30-page Indictment.

From the early days of undersigned counsel W. Gary Kohlman's appearance, the defense in this case pressed the Government for notice of both Rule 404(b) evidence and predisposition evidence, the latter in the event that Mr. White brought an entrapment defense. The Court ultimately provided some relief on both counts, setting a deadline in May 2026 for Rule 404(b) notice and, to make a long story short, requiring the Government to give notice of predisposition

evidence in a form consistent with the Pretrial Statement requirements for its case in chief, by no later than Friday, September 11, 2026.

No Medicaid or federal government contracts referenced in some of the videorecorded meetings between Mr. White and Kamara made the Rule 404(b) disclosure, but the Government did include these as potential topics about predisposition for a case rebutting the defense of entrapment on September 11th.

Arriving at the evidence introduced at trial, the Government could prove the vast majority of the contents of Mr. White's and Kamara's communications during the undercover operation initiated on June 21, 2024 with Kamara's approval by the FBI to conduct otherwise illegal activity on behalf of the Government. With the exception of unrecorded phone calls, the specific contents of which Mr. Kamara claimed at trial not to remember, audio/video recordings from inside Kamara's car, some audio recordings of phone calls, and some text messages set forth the chronology of the communications between Mr. White and Kamara during the undercover operation. The Government admitted these materials in evidence, with transcriptions appearing at the bottom of the video recordings. Thus, while Government counsel asked scores if not possibly hundreds of times for Kamara to describe, interpret, and give his "understanding" of his and Mr. White's recorded words, they were already placed before the jury.

Further, more detailed discussion of the facts shown at trial appears below in the Argument sections.

On Friday, September 18, 2026, after the Government rested its case, Mr. White moved orally for judgment of acquittal under Rule 29. The Court heard argument, and after the defense indicated the desire to put the instant brief on file, the Court took the motion under advisement.

## LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. *United States v. Sutton,* 706 F.Supp. 3d 1, 12 (D.D.C. 2023) citing Rule 29(a); *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001); *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997). To succeed on a Rule 29 motion, a defendant must clear a 'very high' hurdle." *United States v. Hale-Cusanelli*, 628 F. Supp. 3d 320, 324 (D.D.C. 2022) (*quoting United States v. Pasha,* 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015)). Granting a defendant's motion for judgment of acquittal "is appropriate only when there is no evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983); *United States v. Campbell*, 702 F.2d 262, 264-65 (D.C. Cir. 1983). Judgment of acquittal is inappropriate where "any reasonable factfinder could conclude that the evidence, viewed most favorably to the government, satisfied each element [of the offense] beyond a reasonable doubt." *Id*. at 12-13. In other words, a motion for judgment of acquittal should be granted only when "viewing the evidence most favorably to the government and according to the government the benefit of all legitimate inferences therefrom, a reasonable juror *must necessarily* have had a reasonable doubt as to the defendants' guilt." *Weisz*, 718 F.2d at 437.

## ARGUMENT

As the evidence came in at trial, a reasonable juror must have reasonable doubt as to Mr. White's guilt of bribery. The following discussion disentangles, spreads out, and addresses the Government's crowded bucket of legal theories, noting that trial made clear for the first time the distinct courses of the cash payments and the alleged 3% deal.

### I. AS TO KAMARA'S CASH PAYMENTS TO MR. WHITE, THE GOVERNMENT CANNOT PROVE BEYOND A REASONABLE DOUBT THAT ANY ONE VIOLATED ANY OF THE BRIBERY PREDICATES AND SUB-PREDICATES

First, the Government has only shown that Kamara, their informant and cooperator, offered and gave cash money to Councilmember White several times, and that Mr. White kept it. Beyond that, there are multiple failures of showing, especially with proof beyond a reasonable doubt, that Mr. White satisfied the elements of bribery as to any of the charged cash payments.

#### A. There Was No Quid Pro Quo To Be Influenced At All

Kamara gave Mr. White cash, but with no sufficiently clear *quid pro quo.* Viewed in the light most favorable to the prosecution, Councilmember White took payments *without* corruptly intending to be influenced to act.

Last week, in *United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723 (D.C. Cir. Sept. 18, 2026), the D.C. Circuit held that the defendant had to have had the specific intent that, in exchange for the thing of value, he intended to be influenced to act in the prohibited ways. *See id.* at *10 (holding the jury was correctly instructed as to corrupt intent that the "Government must prove beyond a reasonable doubt that the Defendant intended to be influenced in the performance of a specific official act or acts). Meanwhile, it was incorrect to instruct the jury that: "A public official acts corruptly if the public official ... agrees to accept something of value with the understanding, at least in part, that, in exchange, the public official

*is expected* to be influenced . . . ." *Id.* (emphasis in original) (discussing corrupt intent to commit an official act). A public official's mere knowledge that another person expects him to be influenced is insufficient; the public official himself must intend to be influenced. *Id.* (emphasis in original).

In other words, Mr. White's intent matters; Kamara's does not. In the first alleged payment video, there is a clear lack of any kind of *quid pro quo*: Kamara simply shoved the envelope towards Councilmember White with no specific action requested or solicited. (GEX 14, at 2:13-2:24.) Councilmember White did not accept the bribery: in his own words, Councilmember White says, "I don't want to feel like you got to give me something to get something done. We better than that." (GEX 14 at 2:23-2:27.) Kamara responds in acknowledgement that this is not a bribery: "I'm not saying use this to go do that." (GEX 14, at 2:32-2:34.)

In the first meeting, Kamara had announced his plan to make a series of next payments to Mr. White, "hitting you off," without there being a clear bargain in exchange for anything. (GEX 14, at 3:32-3:35.)

In fact, Mr. White made clear before the first recorded meeting was over, in direct reference to the cash, that "I got some campaign debt I need to take care of." (*Id.* At 5:19-5:22.) This accords with Kamara's statement to the FBI just days earlier that Mr. White had a need for campaign money, and Kamara had intended to provide him with cash. (Def. Ex. 103.)

Departing further from the Government narrative that the cash he handed Mr. White was a "bribe," Kamara described on the video a later cash payment as follows: "That's definitely

for your hard work and knocking things out with Kwelli." (Trial Tr. 9/16/2026 AM at 38:17-38:20.) Asked the following questions about this statement by the prosecutor at trial, Kamara gave the following answer:

> Q. When you said "that's definitely for," what did you mean by "that"?
> A. Just pretty much I told him -- really telling him thank you for getting to this point where -- reaching out to Kwelli Sneed, making arrangements to meet with the deputy mayor and trying to make contact with the mayor as well, and the grant manager as well.
> Q. And when you said "that's definitely for that, " that -- what was that for?
> A. Meaning that the 5K that I gave him was telling him thank You.

(*Id.* at 79-80.)

What is being described here is not a federal felony of bribery, and the Government did not charge Mr. White under a gratuity theory.

The FBI and Kamara contrived all five meetings but cannot now spin through argument or interpreting testimony Mr. White's conversations and claim that the cash payments were exchanged for anything, beyond a reasonable doubt.

B. <u>Mr. White Neither Agreed To, Nor Caused, "Official Acts" For the Cash</u>

To the extent that a reasonable juror could conclude from some circumstantial evidence that Mr. White did intend to be influenced **somehow** by the cash payments, then one question is whether his intention was to perform an "official act" as prohibited by § 201(b)(2)(A) or to pressure or advise someone else to commit an official act. No -- a reasonable juror could not conclude this beyond reasonable doubt.

The Supreme Court has specifically held that the acts of information-seeking and arranging meetings are not "official acts" for purposes of the federal bribery statute. *See*

*McDonnell v. United States*, 579 U.S. 550, 569, 573 (2016) ("[b]ecause a typical meeting, call, or event arranged by a public official is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee, it does not qualify as a 'question' or 'matter' under § 201(a)(3)," further stating that meetings merely to "talk about a [project] or to gather additional information" or "simply express support" does not qualify either).

While applying "pressure" to other public officials, even giving them advice, under certain circumstances can satisfy this "official act" requirement, *see id,* at *572-73*, there is no evidence in this case that the **cash payments** to Mr. White were in exchange for that. Kamara's opinion, or counsel for the Government's argument, does not suffice.

The evidence at trial came in crystal clear that Mr. White performed no "official acts" himself, did not pressure anyone in city government to do so, and did not agree to do so for the cash Kamara was handing him. The city officials' testimony established that Mr. White only approached officials like witnesses Anwar Walker and Kwelli Sneed in ways that did not offend the bribery law under *McDonnell*. Kamara's and his FBI handlers may have intended for Mr. White to be influenced by the cash to create pressure, but that is not the legal test. It is Mr. White's intent to be influenced by the cash payments to commit an official act that matters, and there was none. Councilmember White never promised to take an "official act" in his meetings with Kamara, and his receipt of cash was at best contemporaneous with discussion of checking the status of Kamara's D.C. violence intervention contracts:

> Q. And what you asked him to do in that first meeting is look into the status of the contracts that you had right then; correct?
> A. Yes.

Trial Tr. 9/17/2026 PM at 46:9–12,

> * * *
>
> Q. Okay. Thank you. And, in fact, in that first video, whatever date it was, there's not one single time, not one single sentence in which Trayon White says, "I'm going to put pressure on any government official." That's not in there, is it?
> A. No.
> Q. At the end of that meeting, he accepted the money in the envelope; correct?
> A. Yes.
> Q. Just like in the past, he had accepted campaign contributions from you and put them in his pocket; correct?
> A. Yes.
> **Q. You had asked him to look into the status of your contracts; correct?**
> **A. Yes."**

Trial Tr. 9/17/2026 PM at 48:8–22 (emphasis added).

Therefore, the "official acts" prong of the federal bribery statute fails as to the cash payments.

C. <u>No Reasonable Juror Could Find Mr. White Helped Commit Fraud For Cash</u>

When Mr. White made his oral motion under Rule 29 after the Government rested its case, the defense contended there was a complete absence of proof that Mr. White violated § 201(b)(2)(B) by assisting a fraud against the D.C. government, and then the Government ventured its first disclosed theory of how its fraud theory worked:

> MS. ROSS: . . .The defendant had to have accepted the money in exchange for being influenced to commit fraud against the United States. For all intents and purposes, the D.C. government is the United States in this case. Clearly, Mr. Kamara's contracts were with the Department of Youth and Rehabilitation Services, as well as with the Office of Neighborhood Safety and Engagement, the D.C. government. **And those were tax dollars that were being spent on those lucrative government contracts, and the defendant agreed that he would take those contracts out of this -- out of the normal contracting process to try to get them extended.**
>
> Mr. Walker certainly said that there is a standard extension process to make sure that contracts are qualified to be extended, and the defendant, who's going to disregard that,

> go straight to the people in charge, not necessarily because Mr. Kamara's contracts qualified for those extensions, not necessarily because they were the best value for the residents' tax dollars or because they were providing the best services, but because he was getting paid.
> So that -- what committing fraud against the United States really boils down to is whether the defendant attempted to or did cheat the United States; in this case, the D.C. government, out of money and property. By taking the contract out of that normal standard contracting process, that's what he was doing, attempting to cheat the D.C. government.

Trial Tr. 9/18/2026 PM at 24:23-25:22 (emphasis added).

The Government's skeletal theory lacks any evidence at trial that Mr. White understood that he would be "circumventing" a specific required procurement processes by going and talking to program managers to find out what was going on, which is all he actually did and – at most – what a reasonable juror might find he associated with accepting the four cash payments from Kamara.

The defense is prepared to discuss in court certain case law it found on the elements of federal contracting fraud, but the defense still does not know what kind of fraud claim (False Claims Act?) the Government would assert could apply to the facts of this case. It is shooting in the dark and hard-pressed to brief the issue at the present moment. The defense notes that Mr. White enjoys a presumption of innocence and the Government bears the burden of proof beyond a reasonable doubt, which would appear to put the onus on the Government to brief this issue.

The defense will also address the Court's request for case law about "people who "get bribes and kickbacks and that sort of thing pass those costs along to the contract who -- and any [] that issued the contract. So there's a presumption that there's fraud under those circumstances." Trial Tr. 9/18/2026 PM at 30:16-19.

The Court's intuition is correct that bribery can inflate contract values. Moreover, payments that are legally established as illegal bribes can create fraud liability under federal criminal law. *Cf. United States v. Foxworth*, 334 F. App'x 363, 366 (2d Cir. 2009) (there was sufficient evidence for the jury to find that the $3000 was a bribe, therefore defendant's omission of this fact was material to approval of contract under wire fraud theory). The kind of theory raised by the Court would be academic and extraneous if the Government could already establish the payments to Mr. White were bribes, such as in exchange for an "official act." There should be no leap-frogging over this requirement. The defense is unaware of any cases where the evidence could satisfy the bribery predicate offense of fraud under § 201(b)(2)(B) with no finding as a threshold matter that a payment was a bribe through some cognizable theory. At the time of filing, the defense is still looking when possible for cases as suggested by the Court.

Second, while the defense is aware that bribery can result in contract amount inflation, Mr. White is at least one step – if not many more -- removed from defendants found guilty for inflating contracts with bribes. There is simply no evidence in the record that Mr. White understood the invoicing and cost structure of Kamara's contracts, and thus could be a knowing participant in a fraud on the District of Columbia.

D. Mr. White Did Not Commit Any Violation of Official Duty Bribery

**1. Conflict of Interest**

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received the cash payments with the corrupt intent of intending to be influenced to use his position to influence the outcome of a matter that he knew was likely to have a direct effect on his financial interests. This allegation keys off of D.C. Council Code of Conduct, Period 25, p. 2, I(a), GEX 1 (redacted version).

The evidence at trial came in that Mr. White was having innocuous meetings with city officials seeking information about Kamara's contracts, and that was the point of the cash payments according to discussions with Kamara, as discussed above. Therefore, this theory of bribery fails.

### 2. Official Acts

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received anything of value in return for being influenced in the performance of official acts in violation of his local ethics code's "official acts" bribery prohibition at the D.C. Council Code of Conduct, p.10, III(e)(2). This argument mirrors the argument above as to § 201(b)(2)(A).

### 3. Confidential or Privileged Information

No reasonable juror could find proof beyond a reasonable doubt that Mr. White received anything of value in return for being influenced to disclose or use confidential or privileged information acquired by their position without authorization. This allegation keys off of D.C. Council Code of Conduct, Period 25, p.19, VII(1), GEX 1 (redacted version). The defense is unaware of an iota of confidential or privileged information discussed at trial in connection with Kamara's contracting.

## II. NO OFFENSE OCCURRED FROM A PROPOSED AGREEMENT FOR MR. WHITE TO RECEIVE 3% OF THE PROCEEDS OF RENEWED D.C. CONTRACTS FOR VIOLENCE INTERVENTION IF MR. WHITE SEALED THEM UP

Furthermore, as to the alleged 3% deal for "sealing up" Kamara's violence intervention contract extensions, no reasonable juror could find that there is proof beyond a reasonable doubt of all of the elements of bribery, under either of the three provisions of § 201(b)(2). Kamara introduced this proposed arrangement into the second undercover meeting on July 17, 2024.

A. <u>There Was No Agreement as to 3%</u>

First, it cannot be found to be beyond reasonable doubt that Councilmember White even accepted the 3% offer, because he replied in that meeting to Kamara about it:

> MR. WHITE: I mean, uh, we, we good.
> MR. KAMARA: Yeah.
> MR. WHITE: We can worry about the money later. Stay on -- stay on mission and make sure we still -- "

Gov. Ex .15 12:00-12:09. A reasonable juror would have to hold the doubt that Councilmember White was actually telling him “we good” as in: Kamara doesn't have to pay him.

On the stand, Kamara even alluded to the lack of a solid agreement while discussing the third undercover video.

> Q. And what did you understand the point to be of setting up this meet -- of these meetings?
> A. Just pretty much at this time now, I think he has close to 25 or 30,000 that I've given him.
> Q. And so what was the point of these meetings?
> A. For us to solidify our agreement that he'll get 3 percent.

Trial Tr. 9/16/26 PM at 95:6-12.

Clearly, at this point, Kamara thought that the agreement was still not solidified. As to Councilmember White, similarly, he simply never accepted Kamara's offer nor intended to do anything in exchange for it. In other instances where Kamara brings up the contract, Councilmember White sometimes redirects the conversation or does not intend to do what Kamara wants him to do which is seen by the Councilmember's lack of doing anything problematic in exchange. Furthermore, the Councilmember never materially engages with the terms of the agreement which would be reasonable for someone who actually intends to partake in an agreement. Kamara is the only one that talks about payment terms, amounts, etc.

B. Mr. White Did Not Have the Corrupt Intent to Be Influenced

As argued above in connection with the cash payments, there is a failure of proof beyond a reasonable doubt in this case that Mr. White had the specific intent that, in exchange for the thing of value, the 3% share Kamara offered, he intended to be influenced to act in the prohibited ways. *See United States v. Burke*, No. 25-3104, -- F. 4th --, 2026 WL 2794723, *10 (D.C. Cir. Sept. 18, 2026). A public official's mere knowledge that another person expects him to be influenced is insufficient; the public official himself must intend to be influenced. *Id*. Mr. White's actions in doing nothing with city officials like he was saying he was to Kamara establishes reasonable doubt as to his intent to be influenced. Kamara's intent and understanding does not count.

C. There Was No Act in Furtherance of the Alleged 3% Agreement

As the Court has decided, the jury "must unanimously agree on the overall scheme and at least one of the specified acts in furtherance of the scheme" *United States v. White,* No. CR 24-406 (RC), 2026 WL 1361545, at *4 (D.D.C. May 15, 2026).

D. Mr. White's Alleged 3% Deal Contemplated No Fraud By Kamara

As argued in the section above as to the cash payments, there is no evidence in the trial record of Mr. White understanding that Kamara was engaged in any fraud in the violence intervention programs. There is no reason for the Court to entertain, or allow the jury to entertain any unsubstantiated theory about the circumvention of procurement controls, or any other theory.

E. The 3% Discussion Included No Violation as to Confidential Information

As argued above as to the cash payments, there was no evidence in the trial record as to the breach of confidential or privileged information, so the Court should grant judgment of acquittal based on this theory.

III. CONVICTION ON COUNT ONE CANNOT BE BASED ON DISCUSSIONS OF MEDICAID AND FEDERAL CONTRACTING, WHICH ARE BOTH INSUFFICIENT AND AN IMPROPER VARIANCE BETWEEN ALLEGATIONS AND EVIDENCE

Given mixed signals from the Government at Friday's Rule 29 oral motion hearing, Mr. White argues that a conviction cannot be based on his discussions with Kamara about a Medicaid contacting possibility and unspecified federal contracting possibilities.

The Government disclaimed any intent to rely upon the federal contracting possibilities, on which it spent time questioning Kamara:

> **We're not arguing that he violated any sort of statute in this case. We're talking about the federal contracts.** That's just in the evidence. And certainly, it provides additional evidence that the defendant agreed to Mr. Kamara's terms with respect to his contracts with ONSE and DYRS, because it shows motive, intent, opportunity, all those kind of things. **But are we going to argue to the jury that that is somehow part of the reason he's guilty of bribery in this case? No, we're not, Your Honor.**

Trial Tr. 9/18/26 PM at 27:7-15 (emphasis added).

Mr. White takes the Government at face value here, despite both prior and subsequent invocations of the "inextricably intertwined" and "intrinsic" evidence labels both prior to, and subsequent to its disclaimer above. Therefore, the Court should simply rule that federal contracting discussion is not a basis for finding bribery. It was, after all, nowhere in the Indictment.

This leaves the Medicaid contracting possibility, upon which the Government did not disclaim reliance in the oral Rule 29 hearing.

The divergence between the allegations of the indictment and proof at trial has been both materially variant and substantially prejudicial. *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988). As such, it will have a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006).

The addition at trial of the Medicaid mental health/Charles Moreland to the Government's theory of how the jury could convict would be, first, a clear and harmful variance from Count One of the Indictment, which specified exclusively D.C. contracts for violence intervention with other agencies than handle Medicaid.

Moreover, the evidence can hardly be called necessary for proof of the charges that are in Count One, nor has the Government advanced a claim to that effect.

This contracting possibility was among the topics noticed in the Government's predisposition notice letter as an "additional" contract, not anything intrinsic to the Government's case. (ECF 104, Exhibit A, at Paragraph X, attached to Trayon White's Objection to Government's Notice of Predisposition Evidence to Rebut Trayon White's Entrapment, filed under seal).

As the defense has noted, the Government failed to invoke Rule 404(b) to bring in this Medicaid discussion, giving notice in May 2026 as required.

Even if the Government had done so -- and now in any event -- the Medicaid discussion on the recordings was extremely weak in value probative of wrongdoing by Mr. White, and highly prejudicial and confusing to the jury. Among other things, the contracting possibility was speculative, its intended timing unclear, and Mr. White's intentions of having a role in dealing

with the city government not elaborated. This was brainstorming near the point of inception. The only thing the jury learned was that Mr. White intended to, and did, introduce Kamara to a private citizen, an attorney, for Kamara to potentially receive legal advice. The Government failed to play the undercover recordings it made of a meeting with attorney Charles Moreland, Kamara, and Mr. White, nor elicit from Kamara what he discussed with Moreland on a subsequent call noted in the record. Kamara testified he did not record this call because it was not necessary – which itself is some evidence that this vignette was a frolic-and-detour from the FBI investigation. Only at trial, seeking to throw in the kitchen sink, did the Government attempt to develop the vignette as part of its case to convict on Count One. The Court should disallow this theory.

**CONCLUSION**

WHEREFORE, the defendant respectfully requests that his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, be GRANTED.

Dated: September 20, 2026

Respectfully submitted,

*<u>/s/ Warren Gary Kohlman</u>*
Warren Gary Kohlman (DC #177527)
1845 R Street Northwest
Washington, DC 20009
202-497-4468
Email: gwkohlman@gmail.com

*Counsel For Defendant Trayon White, Sr.*

*<u>/s/ Bruce H. Searby</u>*
Bruce H. Searby (DC # 1012382)
Nicole C. Ledesma (DC # 90020184)
SEARBY PLLC
2000 P Street NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Email: bsearby@searby.law

*Counsel For Defendant Trayon White, Sr.*

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of September 2026, this RULE 29 MOTION BY TRAYON WHITE, SR. FOR JUDGMENT OF ACQUITTAL was served via electronic mail on chambers, and counsel of record by ECF/CM filing.

Respectfully submitted,

*/s/ Bruce. H. Searby*